```
 1            UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF FLORIDA
 2                   MIAMI DIVISION
 3                    CASE NO.:  1:21-cv-23148-MGC
 4
     LEIGH ROTHSCHILD,
 5
              Plaintiff,
 6
     vs.
 7
     GREAT NORTHERN INSURANCE
 8   COMPANY,
 9            Defendant.
     _____/
10
                        Via Zoom Videoconference
11                      Monday, July 11, 2022
                        10:12 a.m. - 11:34 a.m.
12
13
14            DEPOSITION OF JEFFREY L. BRADLEY
15
16
17
18
19
20
21            Taken on behalf of the Plaintiff before
22   Diana Santos, Shorthand Reporter and Notary Public
23   in and for the State of Florida at Large, pursuant
24   to Notice of Taking Deposition filed in the above
25   cause.
```

Page 2

```
 1  APPEARANCES:
 2
        JOSEF TIMLICHMAN, ESQUIRE
 3      JOSEF TIMLICHMAN LAW, PLLC
        18851 NE 29th Avenue
 4      Suite 700
        Aventura, Florida 33180
 5      Telephone: (305)748-3789
        E-mail: josef@lawnowfl.com
 6      Attorney for Plaintiff
 7
 8      EVAN M. HOLOBER, ESQUIRE
        COZEN O'CONNOR, P.A.
 9      200 S Biscayne Blvd
        Suite 4410
10      Miami, Florida 33131-2303
        Telephone: (786)871-3959
11      Email: Eholober@cozen.com
        Attorney for Defendant
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              INDEX
 2
 3  WITNESS                       PAGE
 4  JEFFREY L. BRADLEY
 5    Direct Examination by MR. TIMLICHMAN  .........5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1     PLAINTIFF'S EXHIBITS FOR IDENTIFICATION
 2  NUMBER          DESCRIPTION           PAGE
 3  Exhibit 1    Subpoena Duces Tecum for ..........7
                 Deposition
 4
 5  Exhibit 2    Notice of Expert Disclosure ........8
 6
    Exhibit 3    Donan Invoice .....................9
 7
 8  Exhibit 4    Jeffrey L. Bradley's .............10
                 Professional Profile
 9
10  Exhibit 5    Litigation Summary ...............17
11
    Exhibit 6    Report ..........................21
12
13  Exhibit 7    Allied Engineer Report ...........45
14
    Exhibit 8    Infrared Photos ..................66
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1  Thereupon,
 2           JEFFREY L. BRADLEY
 3  Was called as a witness and, having been first duly
 4           sworn and responding, "I do," was examined
 5           and testified as follows:
 6           DIRECT EXAMINATION
 7  BY MR. TIMLICHMAN:
 8     Q   Mr. Bradley, thank you for being with us
 9  this morning.  I appreciate that.
10           I'll get right into it.  Hopefully, we
11  won't have to be here for too long this morning, and
12  let me set some quick ground rules for us for today.
13           We've got a court reporter.  We are doing
14  the deposition remotely, so it's going to be hard
15  for the court reporter to capture every portion of
16  our conversation if we don't allow each other to
17  finish, which I'm usually guilty for, and if we
18  don't give complete answers.  If you give an answer
19  we're going to assume that you understood the
20  question and you've answered the question that was
21  asked of you.
22           Obviously, you're under oath.  You're here
23  today to discuss the Leigh Rothschild, Plaintiff,
24  versus Great Northern Insurance Company Florida,
25  case number 121-cv-23148-MGC.
```

Page 6

1        Mr. Bradley, my first question is have you
2   ever been deposed before?
3        A   Yes.
4        Q   Okay.  Good.  So I don't have to give
5   you -- that's one of my shorter versions of the
6   ground rules is beneficial to all parties.
7            All right.  I've got some premarked
8   exhibits.  What I'm going to show you first is
9   what's been previously marked as Exhibit 1.
10           MR. TIMLICHMAN:  Ms. Santos, if you will
11       allow screen sharing.  There we go.  I
12       appreciate that.
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 7

1            (Thereupon, Plaintiff's Exhibit 1 was
2   marked for identification.)
3   BY MR. TIMLICHMAN:
4        Q   Mr. Bradley, I've have marked as Exhibit
5   1, which is the subpoena duces tecum for deposition.
6   The date was obviously changed, but have you seen
7   this document before?
8        A   I saw one subpoena.  I'm not sure if it
9   was the same one, but keep going.  Yes.
10       Q   As part of responding to this subpoena,
11  did you go through the areas of inquiry on the
12  subpoena?
13       A   Yes.
14       Q   And did you provide your counsel with
15  whatever items you may have that are subject to the
16  subpoena?
17       A   I forward through our litigation
18  department, and they forward the relevant items we
19  had through Evan, the items.
20       Q   Okay?
21       A   The items we had.  Some documents we did
22  not have documents on.
23       Q   Understood.  But if you had it you sent
24  it?
25       A   As far as I know.  Our litigation

Page 8

1   department did, yes.
2        Q   I'm going to show you now what has been
3   previously marked as Exhibit 2 and this is the
4   Notice of Expert Disclosure.
5            (Thereupon, Plaintiff's Exhibit 2 was
6   marked for identification.)
7   BY MR. TIMLICHMAN:
8        Q   Are you aware that you were listed as
9   Great Northern Insurance Company's expert witness as
10  a forensic engineer, in this matter?
11       A   I don't know if I've seen this document or
12  not.  I can't say yes or no, but I would assume so
13  since we are at this stage.
14       Q   Okay.  I can't say I've seen this specific
15  document though.
16       A   Sure.
17       Q   And are you prepared to testify as to the
18  cause of damage to plaintiff's property --
19       A   Yes.
20       Q   -- in today's depo?
21       A   Yes.
22       Q   And let me just show you one more exhibit.
23  This is what'll be marked as Exhibit 3, and I would
24  ask if you're familiar with this -- I'm sorry.  Let
25  me strike that.

Page 9

1            (Thereupon, Plaintiff's Exhibit 3 was
2   marked for identification.)
3   BY MR. TIMLICHMAN:
4        Q   I'm showing you what has been
5   previously --
6            MR. HOLOBER:  You cut out.  I don't know
7        if you cut out for everybody.  I didn't hear
8        the question.
9            MR. TIMLICHMAN:  I was striking my own
10       question and saying I am now showing you what's
11       previously been marked as Exhibit 3, which is
12       the Donan invoice.
13  BY MR. TIMLICHMAN:
14       Q   And I'm asking if this looks like an
15  accurate copy of your invoice.
16       A   Yes, it is.
17       Q   Have you invoiced -- to your knowledge,
18  has there been any additional invoices since this
19  invoice?
20       A   Not since this invoice.
21       Q   According to this invoice, you went to the
22  location sometime before January 6th, 2021?
23       A   January 6th would probably be the date
24  that I did go to the site.
25       Q   I got it.  And are you familiar with how

Page 10

1 long after the loss was from that date?
2    A   It was reported in November of that year.
3 Let me check.
4    Q   And to be clear, Mr. Bradley, what is the
5 scope of your testimony in this case?
6    A   The cause of the water loss.
7    Q   And it's only that?  You're not here to
8 determine the cost of repair or anything outside
9 what the cause of the water loss is; isn't that
10 correct?
11    A   I'm not here to testify on the cost of
12 repair.  There may be other items I'm not aware of,
13 but primarily to determine the cause of the water
14 loss.
15    Q   Okay.  So we got some of these
16 housekeeping matters out of the way in terms of the
17 invoice, the notice and all that stuff, so I
18 appreciate that.
19        So let's get into a little bit of your
20 background, Mr. Bradley.
21        I'm going to show you now what's been
22 previously marked as Exhibit 4, and I believe that
23 this is a document that you provided to us through
24 your counsel.
25        (Thereupon, Plaintiff's Exhibit 4 was

Page 11

1 marked for identification.)
2 BY MR. TIMLICHMAN:
3    Q   Is this an accurate reflection of your
4 professional profile from what it looks like?
5    A   Yeah, from what it looks like, yes.
6    Q   Can you give me a quick background of your
7 engineering experience.
8    A   Engineering experience in HVAC design,
9 plumbing design, Class A truck design, and then most
10 recently with Donan, basically any type of plumbing
11 failures, roof inspections, water intrusions, water
12 losses, automotive repairs, roofs.  A lot of stuff
13 having to do with water intrusion.
14    Q   So let me ask you a question.  I'm going
15 to take this exhibit down what's been previously
16 marked as Exhibit 4.
17        What did you do to become an engineer?
18    A   I went to an accredited four-year
19 engineering university.  Graduated with an
20 engineering degree.  I had to pass a fundamental
21 engineering exam initially.  I passed that exam.  I
22 was a professional engineer for four years, and then
23 had to pass a professional engineer exam after that
24 and then became a professional engineer.
25    Q   The engineer you worked under, what was

Page 12

1 his specialty?  What was his field of specialty?
2    A   Probably truck design.
3    Q   So you had not been --
4    A   And another -- I had two engineers,
5 basically; one truck design.  One, basically, HVAC
6 and plumbing.
7    Q   Were you learning about HVAC and plumbing
8 at the same time that you were learning about truck
9 design?
10    A   No.
11    Q   So, generally, you started off in
12 trucking; is that correct?
13    A   No.
14    Q   Where did you start?
15    A   HVAC plumbing.
16    Q   Okay.  And what kind of work, you know,
17 what kind of experience were you gaining in the HVAC
18 plumbing?  What were you being exposed to?
19    A   Basically, sizing HVAC units for buildings
20 and ductwork, designing plumbing systems for
21 buildings, doing construction drawings.
22    Q   The plumbing drawings that you were
23 drawing, were they related to the HVAC systems or
24 were they separate?
25    A   It could be both.

Page 13

1    Q   Did it have a concentration of the HVAC
2 systems you were doing?
3    A   Probably most of the plumbing was for
4 plumbing.  Mostly HVAC was for HVAC.  Usually two
5 separate drawings.  Unless the HVAC was some type of
6 fueled water piping or something, which was not that
7 often for me.  But mostly HVAC drawings were HVAC.
8 Most of the plumbing drawings were for plumbing
9 fixtures.
10    Q   Fair enough.  Did you have any background
11 in plumbing experience before you went to
12 engineering?
13    A   No.
14    Q   And then you mentioned that it seems like
15 a little bit later in your career, when you were
16 working at Duff-Brown Engineering, it looks like you
17 were doing HVAC and plumbing and some fire
18 protection, and then when you went to Peterbilt is
19 that where you were doing most of your trucking --
20 you were getting your trucking experience?
21    A   Correct.
22    Q   With engineering, once you become an
23 engineer, are you able, and I'm just asking because
24 of my own ignorance, are you able to kind of jump
25 around from field to field with the same license?

Page 14

1    A   Most of it is based on your knowledge and
2 experience in that area to practice.  So mechanical
3 engineering is a pretty broad scope.
4    Q   So it's like a lawyer.  You can be an
5 insurance lawyer or a divorce lawyer, but you're a
6 lawyer.  Kind of the same with engineering?
7    A   As long as you're an expert in that field.
8    Q   Got it.  So when you went to Donan, that
9 was in 2009?
10    A   Correct.
11    Q   Is that where you really started getting
12 your experience with water intrusion and all that
13 kind of stuff?
14    A   Correct.
15    Q   What kind of experience were you doing
16 with Donan?  Were you doing drawings?  Were you
17 doing any kind of engineering drawings or was it
18 more based on visual inspection?
19    A   No real drawings.  Most of it was forensic
20 engineering inspection to determine the cause of the
21 problem.
22    Q   And you were basing that on your past
23 experiences with HVAC plumbing, trucking and
24 whatever you had in your education, and using that
25 towards your water intrusion experience; is that

Page 15

1 right?
2    A   And newly acquired experience and
3 knowledge with Donan.
4    Q   Did Donan have somebody, you know, that
5 you worked with that was kind of -- I don't want to
6 say like a mentor, but somebody that was kind of
7 showing you how to become more proficient with water
8 intrusion?
9    A   Yes, I had training when I started.
10    Q   What kind of training did they give you?
11    A   They gave me some classroom training.
12 Gave me four -- my first four weeks were with other
13 project engineers or managers on site, field
14 experience.  And I have been there probably 12 years
15 at numerous continuing education classes.  I've had
16 online Donan continued education classes and various
17 fields.  Basically acquired a lot of knowledge over
18 the 12 years I have been here at Donan.
19    Q   I understand.
20        While working for Donan, have you been
21 working in the capacity of an expert witness
22 throughout the time?
23    A   If needed.
24    Q   Well, let's say you weren't needed as an
25 expert witness, what else would you be doing?  The

Page 16

1 same thing, just looking for water intrusion?
2    A   Just determine the cause of loss of
3 failure on various items.
4    Q   What percentage of your work for Donan
5 would you say is litigation related?
6    A   I don't have any documents to back that up
7 or anything, but it would be very little.  I
8 probably -- I usually go look at a project, write a
9 report, and usually no litigation comes up out of
10 it, but I don't have a specific number.  I wouldn't
11 want to mislead you.
12    Q   That's okay.  I appreciate that.
13        And with Donan do you know what your --
14 who's their base customer?  Is it mostly law firms
15 and insurance companies, you know, looking for
16 expert opinions or is it home buyers that need
17 inspections?  Who is Donan for the most part
18 servicing?
19    A   Again, I don't have the specific document
20 with a background, but Donan will accept projects
21 from homeowners, attorneys, insurance companies,
22 anyone who wants to hire us, we'll work for anyone
23 available.  Unfortunately, I don't have any numbers
24 and I would not want to mislead you.
25    Q   And you've provided -- I'm going to show

Page 17

1 you one more exhibit.  This will be premarked as
2 Exhibit 5 I believe we are up to.
3        (Thereupon, Plaintiff's Exhibit 5 was
4 marked for identification.)
5 BY MR. TIMLICHMAN:
6    Q   This is what was provided to us as your
7 litigation summary.  Is this your complete
8 litigation summary.  You've worked as an expert on
9 two cases in the last 12 years?
10    A   That was the last four years.  There are a
11 few others, but that's the last four years.
12    Q   So not very active on the litigation
13 front?
14    A   Like I said, most projects do not go to
15 litigation for us.
16    Q   Understood.  Do you have any idea why this
17 particular -- strike that question.
18        Have you worked with this insurance
19 carrier before?
20    A   I believe we looked at it for Chubb when I
21 went out there.  We do do projects for Chubb.
22    Q   Do you know what percentage of your work
23 is done for Chubb?
24    A   No.  I don't have any type of
25 documentation saying what number or percentage.

5 (Pages 14 - 17)

Page 18

```
1    Q   Is there anybody in your office?
2        MR. HOLOBER: I may have frozen.  Are you
3    guys able to hear me?
4        MR. TIMLICHMAN: We can hear.
5        THE WITNESS: Yes.
6        MR. HOLOBER: Whatever was said in the
7    last 30 seconds, I did not hear.
8        MR. TIMLICHMAN: I was asking the witness,
9    Mr. Bradley, if he -- what percentage of his
10   work would be for Chubb if he was aware of
11   them.
12       THE WITNESS: I responded I do not have an
13   exact number or a document showing that
14   information.
15   BY MR. TIMLICHMAN:
16   Q   And out of curiosity, is there somebody in
17   your office that would keep those records?
18   A   Not that I'm aware of.
19   Q   Fair enough.  Have you worked with
20   Mr. Holober before?  Holober.  I'm sorry.
21   A   His name doesn't sound familiar, but not
22   that I can recall.
23   Q   I will take that, because he certainly has
24   a unique name like mine.
25   A   Yeah, right.
```

Page 19

```
1    Q   Okay.  Do you know -- do you keep track of
2    what percentage of your work is for a plaintiff
3    client versus a defense client?  So, you know, in
4    our case setting to be -- for clarity.  The
5    homeowner here is the plaintiff and the insurance
6    company is the defense.  So would you have any
7    recordkeeping in terms of, you know, what
8    percentages of your opinion would be made for
9    homeowners versus what percentages of your opinion
10   would be made for insurance companies?
11   A   I do not have any such documentation or
12   seen any documentation which documents that.
13   Q   Going back to Exhibit 5 with your
14   litigation experience that you provided, I'm going
15   to show it to you again real quick.
16       Do you recall in these cases if you
17   represented the homeowner or if you represented the
18   insurance company and I will make this a little
19   bigger for you?
20   A   The top one where the insurance company
21   retained by, so we are a defendant.  The second one
22   I'm not sure, because there's multiple parties.  It
23   involved a water heater in a commercial space and
24   there's two or three different tenant spaces that
25   were affected by the damage from the water heater.
```

Page 20

```
1    We represented one of the tenant spaces, but I'm not
2    sure if we were involved.  It may have been another
3    suite or another space that was --
4    Q   Affected by it?
5    A   -- affected by it, yes, more.  So that one
6    I do not know if we are defendant or not.
7    Q   Understood.  And in the case here you said
8    you had a trial.  Did you actually testify at trial
9    in the Roller Works, Inc. versus the State Auto
10   Property Casual case?
11   A   Yes.
12   Q   Was your testimony limited in any way
13   during that trial?  Anything in your report limited?
14   A   It was limited.  I believe the attorney
15   had to provide basically statements from my report
16   and we were handed items that we could read, and
17   that was the only information that we could read.
18   Other attorneys could ask questions afterwards, but
19   in this federal court in Nashville, this judge
20   basically read a piece of paper and that was your
21   testimony.
22   Q   Yeah, they would definitely keep it tight.
23       Okay.  So let me get this off the screen
24   and I think that should be enough in terms of the
25   background of information.  We went through
```

Page 21

```
1    everything.
2        Let's get into your actual report.  So in
3    this instance you prepared a report; is that
4    correct, Mr. Bradley?
5    A   Yes.
6    Q   Okay.  Do you recall the circumstances of
7    this event at all?
8    A   Yes.
9    Q   Tell me what you recall.
10   A   I recall an outdoor patio that leaked into
11   the garage structure below, partly damaging a
12   vehicle or getting water on a vehicle below were the
13   basic circumstances of it.
14   Q   Okay.  And I'm going to show you quickly
15   your report.  It's going to premarked as Exhibit 6.
16       (Thereupon, Plaintiff's Exhibit 6 was
17   marked for identification.)
18   BY MR. TIMLICHMAN:
19   Q   And I'm going to show you a report.  We
20   are going to spend some time talking about this
21   report, okay.
22       This looks like a true and correct copy of
23   that report; is that correct, Mr. Bradley?
24   A   Yeah, so far, yes.
25   Q   Let's just do a quick scan to make sure
```

Page 22

1 that you agree that this is your report. And this
2 looks accurate to you, Mr. Bradley?
3     A   Yes, yes.
4     Q   I want to make sure we go through all of
5 it, because we don't want to have any issues later.
6 And then you've got a bunch of pictures in the end
7 and they are pictures that you saw, yeah?
8     A   Yes, those are my pictures.
9     Q   And then you subsequently had sent us a
10 bunch of pictures?
11    A   Yes, our litigation department should have
12 sent you all of the photos I took that day.
13    Q   That's quite okay. All right. I have
14 some brief questions on this. We won't be here too
15 long.
16        So my first question is in your first
17 paragraph you write here "The purpose of the study
18 was to determine the cause of the water intrusion
19 through the patio into the parking garage"; is that
20 correct?
21    A   Yes.
22    Q   And that is the scope of this report?
23    A   Yes.
24    Q   So that means any conversation or any
25 opinion outside the cause of the water intrusion

Page 23

1 would be outside the scope of this report; is that
2 correct?
3     A   Not necessarily.
4     Q   You would agree that you were hired as a
5 forensic engineer to determine specifically where
6 the water came from; right?
7     A   Yes.
8     Q   And you ultimately in your repot you
9 correlated the water intrusion to Tropical Storm
10 Eta, right?
11    A   Yes.
12    Q   How'd you do that?
13    A   The reported loss on our paperwork was
14 November 25th, which was very little rain and large
15 quantity of water probably a week or two before that
16 from Tropical Storm Aida (phonetic), so it's my
17 opinion that the water originated from the Tropical
18 Storm Aida.
19    Q   Let me ask you a question, Mr. Bradley.
20 You mentioned that there wasn't enough rain on May
21 the 25th. Are you relying on Tropical Storm Eta for
22 the proposition that Tropical Storm Eta brought a
23 lot of water with it, a lot of rain?
24    A   Can you rephrase that or say it again?
25    Q   Well, I'm asking why did you determine --

Page 24

1 what was it about Hurricane Eta that made you
2 determine that that was the cause of water
3 intrusion -- loss -- the cause of the water?
4     A   Because there's significantly a lot more
5 water during those four days compared to afterwards.
6     Q   Are you -- and respectfully, Mr. Bradley,
7 are you qualified to do weather analysis reports?
8     A   I research weather on almost every project
9 that I do.
10    Q   I understand that, but I asked you are you
11 qualified to do a forensic weather report?
12    A   Not I don't know exactly what's involved
13 in a forensic engineering report, but I am more than
14 qualified to do engineering weather research in my
15 reports.
16    Q   Okay. But my question again, and I'm not
17 trying to get under your skin or anything like that.
18    A   No, I know.
19    Q   Are you qualified specifically to do
20 weather forensic reports?
21    A   I've never done a forensic weather report,
22 but like I said, I'm more than qualified to do
23 weather research for a report. I'm not sure exactly
24 what a weather research report is.
25    Q   I asked you how much additional research,

Page 25

1 outside of Hurricane Eta, did you do?
2     A   I looked for the majority of the month of
3 November of 2021 -- 2020.
4     Q   What dates did you stop looking for
5 weather on?
6     A   Probably the end of November.
7     Q   And when was Hurricane Eta considered
8 over?
9     A   I'm not sure when it was over, but between
10 November 9th and November 13th was the most
11 significant rain from that storm and at this
12 location.
13    Q   What makes you qualified to say -- strike
14 that.
15        Let me show you what's been previously
16 marked as Exhibit 6. Were you given a copy of this
17 expert weather report, Mr. Bradley?
18    A   Yes.
19    Q   Did you take a look at this report?
20    A   Yes.
21    Q   My first question is would you be
22 qualified to have any opinion as to the contents of
23 this report or what this expert is saying?
24    A   Yes, I reviewed the report and I basically
25 agree there was some small amount of rain on

7 (Pages 22 - 25)

1 November 20th.

2   Q   Well, I think there's a deeper thing here.

3   A   What is that?

4   Q   According to this report, Hurricane or

5 Tropical Storm Eta was over as of 10:05 a.m. Monday

6 November 9th, 2020.  So you mentioned there were

7 four days of rain after November 8th.  My question

8 is are you qualified to make any kind of forensic

9 expert opinion as to the weather?

10   A   I wouldn't be able to on dates and rain

11 amounts on those dates.  I would have to go back and

12 look to see the tropical storm's path.  But from

13 November 9th to November 13th a tremendous amount of

14 rain fell at that residence.

15   Q   But I'm asking --

16   A   That was initiated from Tropical Storm

17 Eta.

18   Q   Okay, Mr. Bradley, but what I'm asking you

19 is again --

20   A   Yes.

21   Q   -- are you qualified to make an expert

22 opinion as to the weather?

23      MR. HOLOBER:  Asked and answered.

24 BY MR. TIMLICHMAN:

25   Q   You can answer, Mr. Bradley.

1   A   Yes, I do weather research on most

2 projects, yes.

3   Q   What makes you qualified to make expert

4 opinion as to weather?

5   A   I researched weather for 12 years on most

6 projects.

7   Q   Do you have any formal training?

8   A   On-the-job training.

9   Q   Who taught you?

10   A   Various people.

11   Q   Any of those people weather experts?

12   A   I don't know.

13   Q   Are they meteorologists?

14   A   I don't know.

15   Q   Are you a meteorologist?

16   A   No.

17   Q   So if an expert tells you on November 9th,

18 2020 there was no more Hurricane Eta, would you be

19 qualified to say otherwise?

20   A   I would have to do some further research,

21 but, yes.

22   Q   You would be qualified to rebut a weather

23 expert is what you're saying?

24   A   If you're talking about precipitation on a

25 specific date or not, yes.

1   Q   Well, I'm showing you a weather expert

2 report that says as of November 9th, 2020, Hurricane

3 Eta or Tropical Storm Eta was no longer in that

4 region.  Would your opinion be better than their

5 opinion; is that what you're trying to say?

6      MR. HOLOBER:  Form.

7      THE WITNESS:  I'd have to do further

8   research.  I know significant rain from this

9   tropical storm came on November 9th through the

10   13th.

11 BY MR. HOLOBER:

12   Q   Well, how do you know that the rain from

13 November 13th, for example, had anything to do with

14 Tropical Storm Eta?  How do you know it's not a

15 different weather pattern?

16   A   Yeah, and I would have to do further

17 research to rebut this statement.

18   Q   Did you do that research at the time of

19 issuing your report?

20   A   Yes, I researched precipitation data when

21 I did the report.

22   Q   So in your precipitation data you found

23 that there were heavy falls of rain on November

24 10th, 11th, 12th and 13; correct?

25   A   Yes.

1   Q   What research or qualifications did you

2 have to determine whether or not the rain that fell

3 on November 11th, 12th or the 13th had anything to

4 do with Hurricane Eta?

5   A   I believe the system was still moving over

6 Florida and pretty close to it.  I would have to do

7 some further research on the specific dates Eta

8 influenced the area.

9   Q   Mr. Bradley, respectfully.  My question

10 was what research and what qualifications do you

11 have to make that distinction?

12   A   There is a tropical storm --

13   Q   Hold on.  Let's break it down.  When you

14 wrote your report --

15   A   Yes.

16   Q   -- what research, aside from looking up at

17 the precipitation data on those dates, did you do to

18 determine whether or not the weather on

19 November 13th or the 12th or the 11th were weather

20 patterns that had anything to do with Hurricane Eta?

21 If you didn't do that research, that's okay.  It's a

22 yes or no answer.  Did you do any research to

23 determine the weather patterns on November 10th,

24 11th, 12th or 13th had anything to do from Hurricane

25 Eta, aside from looking up the precipitation?

1     MR. HOLOBER:  Form.
2     THE WITNESS:  I looked up precipitation.
3  Tropical storm was in the area.  I made my
4  basis that it was influenced by a tropical
5  storm.
6  BY MR. TIMLICHMAN:
7     Q   Okay.  Where in your report does it show
8  that on November 11th, 12th, 13th Hurricane Eta was
9  over this apartment?  Where in the report does it
10 show that?  On what page?
11    A   Page 4 is basically giving a cumulative
12 total of precipitation during this storm and its
13 influence over Southern Florida -- a total
14 precipitation from this storm.
15    Q   Where on this snapshot that you pulled out
16 does it say on November 14th, 2020 that this rain
17 that fell on November 14th was a product of
18 Hurricane Eta?  Where does it say that here?
19    A   It does not.
20    Q   And right here where it says "Figure 2
21 rainfall totals for Tropical Storm Eta", you wrote
22 that; right?
23    A   Yes.
24    Q   So the local whether channel is not
25 calling you and asking you to make the determination

1  as to whether or not the rainfall from November 14th
2  was due to Hurricane Eta or not; is that correct?
3     A   No.  I'm saying there's no raining on
4  November 14th.  I don't know where that date came
5  from.
6     Q   It says it right here.  Doesn't it say
7  November 14th, 2020, seven-day observed
8  precipitation; isn't that what it says on the --
9     A   That's the end of the seven days, yes.
10    Q   I understand, but that's what it says on
11 it, November 14th, seven day?
12    A   I guess seven day prior to November 14th
13 would be more accurate; not November 14th.
14    Q   And over here in your Figure 1 you write
15 property location and you put an arrow.  Where is
16 that arrow pointing to?
17    A   It looks like the Atlantic Ocean.
18    Q   Okay.  This is supposed to be a path of
19 the storm; is that correct?
20    A   Yes.
21    Q   Can you point on this red line where this
22 path was over the building complex?  I can zoom into
23 it.
24    A   Can you see anything I do?  That's the
25 centerline of the storm, but rainbands was way north

1  of this line and east of the line.
2     Q   Do you have -- what evidence are you
3  relying on when you say that?  Is there a picture or
4  a graph in your report that shows us rainbands over
5  that line?  Did you include that in your report?
6     A   I included precipitation over a seven-day
7  period of the storm in Figure 2.
8     Q   So I'm going to ask you again,
9  Mr. Bradley, respectfully, are you qualified to make
10 opinions as to the weather?
11    MR. HOLOBER:  Asked and answered.
12    THE WITNESS:  I think I've said what I'm
13    qualified for.
14 BY MR. TIMLICHMAN:
15    Q   So you would agree with me that aside from
16 hopping on Google and researching what the
17 precipitation of the weather was on that given day,
18 is as far as your opinion can take you?
19    A   No, I can tell you the path and dates of
20 the tropical storm's path, the amount of the
21 precipitation during this period.  And I got all my
22 data from the National Weather Service; not Google.
23 I believe that's pretty firm.
24    Q   Okay.  We are going back to what's been
25 previously marked as Exhibit 6 for the expert

1  weather report, and this expert weather report, it
2  says on the top CompuWeather Forensic Weather
3  Experts; is that correct?
4     A   Yes.
5     Q   You don't have that in your qualifications
6  anywhere; right?
7     A   I don't know what that is.
8     Q   Well, it's not in your -- when we read
9  your summary, your background was in trucking,
10 plumbing and HVAC; right?
11    A   And water intrusion, yes.  I do not have a
12 CompuWeather certification or whatever this is.  I'm
13 not sure what this is.
14    Q   And you've never testified as to the
15 weather in any trial; have you?
16    A   Not that I recall.
17    Q   And you've never written a report as to
18 the weather that was used specifically for weather
19 purposes for any trial; have you?
20    A   Not that I recall.
21    Q   Okay.  So --
22    A   Well --
23    Q   -- if this expert report tells us that
24 Hurricane Eta was over in that region as of
25 November 9th, do you have any reason to disagree

9 (Pages 30 - 33)

Page 34

1 with it?
2    A   I am going to retract my last statement.
3 I have testified on weather at my last trial.
4    Q   Which case was that?
5    A   That was the Roller Works one, which was
6 reported wind damage.
7    Q   And what exactly did you testify as to the
8 weather?
9    A   Wind speeds and area on the reported date
10 of loss.
11    Q   And to determine those wind speeds in the
12 area on the reported date of loss, what did you have
13 to do?
14    A   Weather research usually with National
15 Weather Service stations, and that would have been
16 the national airport terminal wind speeds for any
17 given day.
18    Q   So you would agree that your scope in
19 making those determinations is simply looking up
20 data that's available to the public and then
21 transmitting that data into your report; isn't that
22 correct?
23    A   Yeah, research and weather data for my
24 reports, yes.
25    Q   Again, let's break that down.  When you

Page 35

1 say "research", you're not coming up with any
2 opinions.  You're not putting forth any methodology
3 when you're coming up with that opinion.  You're
4 simply -- you're going on the National Weather
5 Service website.  You're typing in the date and
6 you're saying on this and this date these were the
7 headwinds; isn't that correct?
8    A   Yes, gusts and sustained winds.
9    Q   Okay.  But that's the information that's
10 being given to you through a third party that you
11 are then relaying and relying on in your report;
12 isn't that correct?
13    A   Yes.
14    Q   So you didn't make any scientific
15 determination.  You didn't have any higher
16 education.  You didn't have any background to make
17 any further analysis as to that information; isn't
18 that correct?
19       MR. HOLOBER:  Form.
20       THE WITNESS:  Yes, I take that information
21    from the National Weather Service already
22    obtained.
23 BY MR. TIMLICHMAN:
24    Q   So you wouldn't be qualified to take raw
25 data and come to the conclusions that the National

Page 36

1 Weather Service comes to; correct?
2    A   Correct.
3    Q   That would take a weather expert?
4    A   I don't know how it would take.
5    Q   Fair enough.  So you would agree with me
6 again that if we have a weather service advisory
7 expert writing a report that Hurricane Eta was no
8 longer or should I say Tropical Storm Eta was no
9 longer in that area on November 9th, 2020, there's
10 really no reason that you, as an expert engineer for
11 water intrusion, should be rebutting that?
12    A   I would have to do additional research.  I
13 did not see that line when I initially reviewed the
14 report.  I would have to do additional research,
15 because it looks like it actually was in the area
16 twice based on that path, so I don't know where --
17 that's his opinion; not mine.
18    Q   Well, let me ask you a question, Mr.
19 Bradley because you seem like a straight shooter,
20 okay.
21       If you were sitting at the bar, would you
22 want to sit there and have a debate over the weather
23 with the guy who wrote this report or would you
24 simply say that I'm an engineer that figures out
25 where the water came from and you can figure out

Page 37

1 what weather came through?
2       MR. HOLOBER:  Form.
3       THE WITNESS:  I like to do my own
4    additional research before I make that call.
5 BY MR. TIMLICHMAN:
6    Q   I understand, but you agree with me that
7 whatever research you do is simply you looking up
8 information that's provided to you by a third party,
9 relying on that information and then relaying it to
10 whatever opinion you can form based on that
11 information given to you?
12       MR. HOLOBER:  Form.  Asked and answered.
13 BY MR. TIMLICHMAN:
14    Q   You can answer, Mr. Bradley.
15    A   I believe my information retained from the
16 National Weather Service is pretty reliable.
17    Q   I don't disagree with that, but I would
18 respectfully say that any opinion about that
19 information from you would be better served coming
20 from a weather expert; wouldn't you agree with that?
21    A   Not necessarily.
22    Q   Okay.  Let's go on next.  In your
23 observations you write that there's no cracks or
24 fractures in the deck tiles.  There's no cracks,
25 separation or staining along the north wall of the

10 (Pages 34 - 37)

Page 38

1 townhouse that borders the plaza deck.
2        In your experience, if there was settling
3 or foundational settling, wouldn't you have observed
4 cracks in the deck tiles?
5        MR. HOLOBER: Form.
6        THE WITNESS: It's possible.
7 BY MR. TIMLICHMAN:
8    Q    Well, would you be surprised if there was
9 settling and foundational settling and you didn't
10 see cracks in these areas?
11   A    It's possible, depending on the degree of
12 (inaudible).
13   Q    And let me ask you another question. You
14 did a test at the scene and if you give me a second.
15 Let me just get some pictures out. You did a test
16 at the home; isn't that correct?
17   A    Yes.
18   Q    You want to tell me a little bit about
19 that test that you did?
20   A    I basically performed a water test. There
21 was a hose right adjacent to the area. I basically
22 hosed down the area of some wall tile, where the
23 vertical wall met the horizontal tile of the patio.
24 There were some cracks and gaps in the mortar along
25 the wall. I basically poured the water in there for

Page 39

1 about 15 minutes, and I believe an additional 15
2 minutes in the area near the floor drain in that
3 area also.
4    Q    Let me ask you. Is it possible to flood
5 that area with that hose?
6    A    It would take some time and you would
7 probably have to block off the area.
8    Q    How much water would you have to push out
9 to recreate the rain that came through on the 11th,
10 12th, 13th and 14th?
11       MR. HOLOBER: Form.
12       THE WITNESS: I'd have to calculate or
13    estimate. I don't know if there would be an
14    exact way, but it would definitely take some
15    figuring.
16 BY MR. TIMLICHMAN:
17   Q    Well, let me ask you a question. Do you
18 know what the hose -- size of the hose is?
19   A    I did not measure the hose. I'd say half
20 inch to five-eighths inches.
21   Q    You think it's a five-eighths hole. And,
22 Mr. Bradley, if me and you agree it's a five-eighths
23 hose, which I see in your pictures. But I am trying
24 to pull them up to show you, but for the purposes of
25 time, you would agree with me that a five-eighths

Page 40

1 hose poured into that drain is not enough water to
2 cause a flood?
3    A    It did not during my testing.
4    Q    Absent there being a hole in the PVC
5 piping that takes it out through the drain, would
6 you agree with me that it would be virtually
7 impossible for a hose that's spitting out water out
8 of a five-eighths hole to cause that thing to flood?
9        MR. HOLOBER: Form.
10       THE WITNESS: It's possible it can.
11    That's why I tried.
12 BY MR. TIMLICHMAN:
13   Q    Under what circumstances would it be
14 possible, Mr. Bradley?
15   A    If there were larger openings.
16   Q    When you say "larger openings". Larger
17 openings in what?
18   A    Tile, the floor drain, mortar.
19   Q    And when you -- you ultimately came to the
20 conclusion -- you ultimately came to the conclusion
21 that -- let me just pull this back up, so you have
22 the benefit of seeing it.
23       You ultimately came to the conclusion that
24 the cause of the plaza deck water intrusion is
25 installation deficiencies in the waterproofing layer

Page 41

1 and/or the wall flashing; isn't that correct?
2    A    Yes.
3    Q    And if the waterproofing layer and wall
4 flashing was improperly installed, wouldn't the
5 water coming out of that hose have leaked?
6    A    It's possible. Depending on the severity
7 of the leak.
8    Q    Or you mean the severity of how improper
9 the installation deficiencies are?
10   A    It's possible.
11   Q    Let me ask you another question, Mr.
12 Bradley. Is it possible to make an opinion on what
13 the water flashing and the waterproofing layer looks
14 like when it's covered by tile?
15   A    I can't make any observations.
16   Q    So your opinion and you would agree, and
17 I'm looking -- for the purposes of the record, I'm
18 looking now on page 12 and 19 of the record. We are
19 looking at photograph 7 and 8. So when you look at
20 these photos, Mr. Bradley, tell me what you're
21 relying on to come to the determination that the
22 water flashing and water intrusion is not properly
23 installed at this time?
24       MR. HOLOBER: Object to the form.
25       THE WITNESS: I didn't observe any hail

11 (Pages 38 - 41)

Page 42

1  damage, any wind damage, any type of wind blown
2  debris damage, cracks in the tile.  I basically
3  saw no storm-related openings in the tile, and
4  with that in my opinion I was more certain than
5  not that the membrane insulation and flashing
6  would be the most probable cause of the water
7  intrusion.
8  BY MR. TIMLICHMAN:
9      Q    And would you agree with me that that was
10  based on an assumption, Mr. Bradley?
11      A    I don't understand the question there.
12  Assumption of what?
13      Q    Your opinion.  You assumed.  When you made
14  the opinion that the flashing and the waterproofing
15  was not properly installed, you made an assumption
16  when you made that opinion; isn't that correct?
17      A    I made an engineering opinion on that,
18  based on what I saw.
19      Q    Correct.  Based on the fact that there was
20  no peril-created opening.  Based on the fact that
21  you saw no hail damage, right?  You based it on
22  those factors; isn't that correct?
23      A    Correct.  Yes.
24      Q    So it was more of a process of elimination
25  rather than you relying on any specific scientific

Page 43

1  or engineering methodology; isn't that correct?
2          MR. HOLOBER:  Form.
3          THE WITNESS:  That was engineering
4      methodology.
5  BY MR. TIMLICHMAN:
6      Q    What was engineering methodology,
7  Mr. Bradley?
8      A    Eliminating any type of storm-related
9  openings.
10      Q    But --
11      A    And the most certain than not conclusion,
12  I believe, was the flashing and waterproofing.
13      Q    Well, you would agree with me that if the
14  flashing and the waterproofing had been previously
15  damaged, that -- strike that.
16          You would agree with me if the
17  waterproofing and the flashing wasn't properly
18  installed, then there would have been leaks previous
19  to this leak, wouldn't you agree?
20          MR. HOLOBER:  Form.
21          THE WITNESS:  If it was installed
22      properly, I would think it would not leak.
23          MR. TIMLICHMAN:  Right.
24  BY MR. TIMLICHMAN:
25      Q    So if Mr. Rothschild had never had anybody

Page 44

1  complain to him prior to this that this was the --
2  that this was leaking, then he would be okay in
3  assuming that his flashing is okay?
4          MR. HOLOBER:  Form.  Outside the scope of
5      this witness's knowledge.
6          MR. TIMLICHMAN:  You can answer.
7          THE WITNESS:  Rephrase the question again.
8  BY MR. TIMLICHMAN:
9      Q    Well, you said that because there was a
10  leak and you couldn't figure anything out, we
11  couldn't figure any other peril-created opening, and
12  there was no evidence of anything else, that you
13  assume that the flashing and the membrane was
14  improperly installed; right?
15      A    Correct.
16      Q    And my question is if it was improperly
17  installed, wouldn't it have leaked prior to this
18  event -- to this water event?
19      A    I would think it would have.  I think
20  there's evidence that it did.
21      Q    We'll get to that.
22          So would it be safe to say based on your
23  last answer that if Mr. Rothschild lived in that
24  place for 20 years, and never had a leak problem, it
25  was safe for Mr. Rothschild to assume that his

Page 45

1  flashing and waterproofing was installed correctly
2  at least for those purposes?
3          MR. HOLOBER:  Form.
4          THE WITNESS:  That's hearsay.  I have no
5      idea on what he witnessed and didn't witness.
6  BY MR. TIMLICHMAN:
7      Q    I didn't ask what he witnessed.  Just like
8  you made an engineering assumption, I will take it a
9  step further.  On the same level of assumption, if
10  there was no leaks for 20 years, would you have
11  said -- would your opinion have been that the
12  flashing and the membrane is installed right?
13      A    It depends.  I mean, it's possible.  It
14  depends on how much water, how big the leak.
15      Q    Were you given the benefit of looking at
16  Allied Engineering's report?
17      A    Yes.
18          MR. TIMLICHMAN:  I'm going to show you
19      what's been previously marked as exhibit, I
20      believe we are up to 6.  The Allied Engineer
21      Report.
22          (Thereupon, Plaintiff's Exhibit 7 was
23  marked for identification.)
24          MR. TIMLICHMAN:  We are looking at page 19
25      of 22.

12 (Pages 42 - 45)

1      THE WITNESS:  Yes.
2  BY MR. TIMLICHMAN:
3      Q    Does this look like a picture of flashing
4  or waterproofing that was installed improperly?
5      A    You can't tell now.  It's been ripped
6  apart and...
7      Q    Does that look ripped apart to you or does
8  it look like it's in pretty good contact even after
9  removing that tile?
10     A    The top middle.  Someone has obviously
11 pulled that back and I don't know.  There's a lot of
12 destructive things going on there that I wasn't
13 invited to.
14     Q    Well, you are in Tennessee.
15     A    Yeah.
16     Q    By the way, why do you think they chose to
17 use an engineer in Tennessee?  Do you normally do
18 cases in Florida?
19         MR. HOLOBER:  Form.
20         THE WITNESS:  Project volumes sometimes.
21     If they get overwhelmed.
22 BY MR. TIMLICHMAN:
23     Q    But do you normally do cases in Florida?
24     A    Normally I do the whole south.  I don't do
25 many in Southern Florida, but I do do projects in

1  Florida when needed.
2      Q    Would you say less than 5 percent of your
3  work is in Florida?
4      A    I don't have any firm numbers or documents
5  to say one way or the other but...
6      Q    Well, we could say firmly, Mr. Bradley,
7  that without the benefit of actually seeing what's
8  under that tile, it's impossible to actually
9  determine what the actual condition and -- of the
10 floor flashing and waterproofing was; isn't that
11 correct?
12         MR. HOLOBER:  Form.  Misstates testimony.
13     You can still answer.
14         THE WITNESS:  Yes, destructive testing and
15     observation of the flashing and membrane would
16     help determine the -- to see what the issue is.
17         MR. TIMLICHMAN:  Sure.
18 BY MR. TIMLICHMAN:
19     Q    You don't have x-ray vision; right?
20     A    Correct.
21     Q    So you can't see through the floor; right?
22     A    Correct.
23     Q    So you would agree with me if we were all
24 standing there, and you pointed to that tile, and
25 you said, well, I think the membrane is broken, and

1  another engineer said, well, I think there's a hole
2  in the PVC, your bet or your guess would have been
3  as good as his bet at that time; isn't that right?
4          MR. HOLOBER:  Form.
5          THE WITNESS:  We might have different
6      opinions.
7  BY MR. TIMLICHMAN:
8      Q    But you're both guessing, right?  You
9  could say what it is.  At that point you're using
10 your best judgment, right?  You're using your best
11 judgment.  You're using your visual observations,
12 and you're using your experience in the field,
13 right; that's what you're using?
14         MR. HOLOBER:  Form.
15         THE WITNESS:  I'm using those to form an
16     engineering opinion, yes.
17 BY MR. TIMLICHMAN:
18     Q    But you're not using any actual real
19 testing or proven methodology where you could
20 definitively say that is what's wrong with the
21 flooring underneath; right?  You continue do that.
22         MR. HOLOBER:  Form.  Misstates prior
23     testimony.
24         THE WITNESS:  I'm using a scientific
25     method to come up with an engineering opinion.

1          MR. TIMLICHMAN:  Hold on.
2  BY MR. TIMLICHMAN:
3      Q    When you say a "scientific method", what
4  was the scientific method that you did?
5      A    Scientific method.
6      Q    Mr. Bradley, is process of elimination
7  your scientific method?
8      A    It could be.  You come up with different
9  hypothesis --
10     Q    No, no, no.  Mr. Bradley, you're an expert
11 in this case.
12     A    Yes.
13     Q    You have to give me a straight answer on
14 this one.
15         What methodology did you use, and it
16 sounds to me, I'm just looking for a confirmation,
17 that you did a process of elimination methodology,
18 which may or may not be accepted in the engineering
19 world.  I don't care if it is or it isn't at this
20 point.  But what I care is on that day you formed
21 your opinion based on the process of elimination,
22 and what you were able to visually observe with that
23 tile actually blocking the membrane and the flashing
24 underneath it.
25         MR. HOLOBER:  Form.

Page 50

1 BY MR. TIMLICHMAN:
2    Q   Is that correct; yes or no?
3    A   That's a pretty long question.  I think
4 you lost me.  Can you say it again?
5    Q   We'll break it down.
6        Your opinion was based on first, process
7 of elimination; right?
8    A   Scientific methods using various
9 hypothesis, yes.
10   Q   Every time you say "scientific method" you
11 have to explain to us what that scientific method
12 is.  So what's the scientific method?
13   A   Scientific usually involves asking a
14 question, coming up with a hypothesis,
15 determination -- sometimes testing and then reaching
16 a conclusion based on those and something like this,
17 I could come up with several hypothesis.  Was there
18 wind damage?  Was there hail damage?  Was there
19 this?  Was there that?  So, yes, when we say process
20 of elimination, you know, several hypotheses in
21 coming up with the most probable one.
22   Q   And you would agree with me that it
23 wouldn't be as accurate as actually lifting that
24 tile and seeing what's going on in there?
25   A   The more information, the better that

Page 51

1 would provide additional information if there was
2 destructive testing, yes.
3    Q   So on that day the only thing you were
4 able to rely on was your eyes and your experience;
5 isn't that correct?
6    A   Yes.
7    Q   And you would agree with me that this
8 picture of the destructive testing, which we are
9 looking now on page 19 of 22, is the best reflection
10 and the most accurate depiction of what that
11 flashing could have looked like on the day in
12 question; isn't that correct?
13   A   No.
14   Q   Why not?
15   A   It's very -- this tile's been very
16 destructively removed.  The flashing -- the
17 waterproofing level has been ripped up.  It doesn't
18 show the flashing and other areas against the wall.
19 It, you know, I wish I would have been there when
20 this happened to provide additional information.
21   Q   I hear you.  All right.  I won't badger
22 you on it too much more.
23       My other question is you in your report,
24 and I want to just find it, you mention plywood,
25 that you had seen plywood.  Oh, actually, I

Page 52

1 apologize.  You had a second conclusion here.  So
2 let me just back up and show you back to your second
3 conclusion.  I'm going back to Exhibit 5, page 7 of
4 19.  This is your second summary of conclusion.
5 "Based on the heavy corrosion of the ceiling,
6 electrical box and the cement disrepairs of the
7 garage ceiling the water intrusion has repeatedly
8 occurred over a long-term period of years."
9        So my first question to you, Mr. Bradley,
10 is where did you get the qualification to look at
11 staining and determine how long that staining
12 occurred over the years?  Where did that
13 qualification come from?
14       MR. HOLOBER:  Form.
15       THE WITNESS:  On-the-job experience and
16 training.
17 BY MR. TIMLICHMAN:
18   Q   How do you determine between whether
19 something was going on for six months or a year?
20   A   It depends on what we are talking about.
21   Q   I'm talking about staining.
22   A   Staining?
23   Q   I'm talking about corrosion, staining.
24 How can you look at that and determine, as an
25 engineer, whether that was going on for six months

Page 53

1 or a year or can you?
2    A   In this case, primarily the electric box,
3 the corrosion.  There's various rates of corrosion.
4 Corrosion will eat metals certain thickness for
5 years.  This was eaten all the way through, so to me
6 it was years.
7    Q   Well, let me ask you a question,
8 Mr. Bradley.  You're a water expert; right?
9    A   Yes, water intrusion.
10   Q   Sure and you do plumbing and all of that
11 stuff; right?
12   A   Yes.
13   Q   You would agree with me that water follows
14 the path of least resistance?
15   A   Yes.
16   Q   So how could we be so sure that whatever
17 corrosion in that electrical box that you observed
18 was the direct source of the water from that drain?
19   A   It was probably within 30 inches of the
20 drain, and the entire ceiling in both directions of
21 this drain had staining, catholmites (as spoken) and
22 repairs, tremendous repairs in the area in both
23 sides of the drain.
24   Q   So you would agree with me that there was
25 a lot of different pipes and drains in that area as

Page 54

1 well; right?
2    A   There was one floor drain.
3    Q   Sure.  But you'd agree with me that
4 there's a lot of different water piping in that
5 area, right; in water, out water, you have plumbing
6 stacks, you have the drain lines, you have
7 freshwater coming in; right?  It's all over that
8 garage.
9    A   In the floor area that's the only one that
10 I saw in the area of the leak.  There are lots of
11 other pipes and storm water and such in that garage.
12    Q   Do you know if every single unit -- do you
13 know what unit drains to what pipe?
14    A   I primarily looked at this patio and the
15 drain below this patio.
16    Q   And you assumed that this drained into
17 that -- that the patio above drained into this
18 specific drain, right; that was an assumption?
19    A   I did assume the drainpipe below the drain
20 drained into that pipe, yes.
21    Q   Did you happen to see the schematics?  Did
22 you look at the plumbing schematics?
23    A   I wasn't made aware of any plumbing
24 schematics.
25    Q   Did you look at any?

Page 55

1    A   No.
2    Q   Did you ever look at the plumbing
3 engineering drawings from when the building was
4 designed?
5    A   No.
6    Q   Did you request it?
7    A   No.
8    Q   You would agree with me that that would
9 have been a more accurate drawing or layout of which
10 way the plumbing in the building was going; right?
11    A   Not in this case.  I think it was pretty
12 obvious which drain.  I mean, there was no further
13 need for me to research if this drain came from the
14 patio above.
15    Q   Mr. Bradley, was it as obvious as looking
16 at a tile and determining if the flashing underneath
17 the tile that you couldn't see was destroyed?
18       MR. HOLOBER:  Form.
19 BY MR. TIMLICHMAN:
20    Q   Improperly installed, as you called it?
21 Was it as obvious as that?
22       MR. HOLOBER:  Harassing the witness.
23       THE WITNESS:  No.
24 BY MR. TIMLICHMAN:
25    Q   Let me ask you another question.  Did you

Page 56

1 ever look at any of the drawings from the building?
2    A   I didn't know if any were available,
3 but...
4    Q   Aren't drawings from a permit typically a
5 public record?
6    A   Usually a 45-year-old building, it would
7 be hard to find drawings that'll...
8    Q   Did you look at its 40-year inspection?
9    A   I looked into building permits.
10    Q   Did you see its 40-year inspection?
11    A   No.
12    Q   Do you know what a 40-year inspection is?
13    A   No.
14    Q   So in South Florida we have these things
15 called 40-year inspections.  It would have been very
16 important for you to have looked at that document,
17 Mr. Bradley, in coming to an expert opinion in South
18 Florida on the condition of a building.  Because
19 every 40 years a building has to recertify, and then
20 every ten years thereafter, which is why I was
21 curious as to why they would use an engineer from
22 Tennessee because you don't have the benefit of
23 knowing that.
24       So let me ask you another question.  Where
25 in your scope of work did it say for you to

Page 57

1 determine how long the corrosion in the box took
2 place?  That's not in your scope of work; right?
3    A   We were given a scope of work, which was
4 to determine the cause of the water loss and also
5 the water loss was reported on November 25th, so the
6 two didn't quite go together, so I did provide
7 additional information to help support that.  I
8 don't think this was a sole leak on November 25th.
9    Q   But that wasn't the purpose of your --
10 when you got hired, that wasn't the purpose of it,
11 right?  The purpose was for you to determine the
12 cause of the water; not --
13    A   That was the initial scope to determine
14 the cause of the water loss.
15    Q   Was there a subsequent written request
16 from you to go outside that scope?
17    A   I don't believe so.
18    Q   And you'll agree with me that outside of
19 your visual inspection and your opinion based on
20 your experience in the field, there really is no way
21 to determine how long or how many period or what
22 term of years the corrosion of something metal had
23 taken place; isn't that correct?
24       MR. HOLOBER:  Form.
25       THE WITNESS:  There are studies that show

15 (Pages 54 - 57)

1    how much metal is consumed each year.
2 BY MR. TIMLICHMAN:
3    Q    What studies?
4    A    I would easily say years.  At least a year
5 or greater.
6    Q    What studies would you rely on, Mr.
7 Bradley?
8    A    I would have to look on those specific
9 studies that I've seen, but I've seen others that
10 measure the amount of metal consumed over time due
11 to corrosion.
12    Q    Okay.  So as an expert, when you make an
13 opinion you're required to give me any written
14 treaties, peer-reviewed articles or educational
15 material that you rely on in forming your opinion.
16 So I would ask that you supplement your discovery
17 responses with your legal -- to the attorney Mr.
18 Holober, and provide me with what engineering
19 literature you are relying on in coming to the
20 determination that you are for corrosion and being
21 able to observe how many years or months it takes to
22 get there.
23    A    I'll forward that request to Evan and
24 he'll forward it to us and...
25

1    Q    But you would agree with me that your
2 expertise is not in determining how long water
3 intrusion has occurred and determining the corrosion
4 levels; that's not something typical in your scope
5 of work; is it?
6    A    That's incorrect.  We do all the time
7 determine duration of a water loss.
8    Q    Okay.  So how do you make that
9 determination?  What are you basing it on?
10    A    A lot of times we are talking about wood.
11 So we will go by stains in the wood, how dark -- as
12 the wood gets darker over time, as it gets wetter
13 over time.  A lot of times we go on the stains of
14 the wood, the rot of the wood.  If there is metal,
15 basically the rate of consumption and how thick --
16    Q    Let me ask you a question, Mr. Bradley.
17    A    Yes.
18    Q    Would you agree that humidity plays a role
19 in how fast something corrodes or rusts or stains?
20    A    Yes, it could accelerate it.
21    Q    Would you agree that saltwater plays a
22 role in something that corrodes, rusts or stains or
23 rots?
24    A    Yes.
25    Q    Would you agree that this garage sits

1 about 1,000 feet away from the top of the ocean bay?
2    A    I know it's close.  I don't know the exact
3 distance, but it's close.  You can see water.
4    Q    And you'd agree that it's pretty humid in
5 South Florida?
6    A    Yes.
7    Q    Especially during hurricane season?
8    A    Yes.
9    Q    So would you agree with me that
10 determining the corrosion, rot or staining of
11 something is based on your visual inspection and
12 your personal experience in the field rather than
13 some proven test?  Like I can't take a moisture
14 reader, for example, stick it into the material and
15 it give me back a reading and saying that this
16 corrosion happened over two years rather than six
17 months.  You can't do that, right?  You don't have
18 any tools that would do that for you; right?
19        MR. HOLOBER:  Form.
20        THE WITNESS:  Yeah, there's no meters or
21    tools I know that give you duration.
22 BY MR. TIMLICHMAN:
23    Q    So the duration is strictly a matter of
24 your visual observation of the item and your
25 personal experience in the field; isn't that

1 correct?
2    A    And scientific research.
3    Q    What research, Mr. Bradley?  Remember,
4 you're opening the door for me to ask you more
5 questions and I don't want to do that to you.  But
6 when you say "scientific research" I will go back to
7 my original request and say any scientific research,
8 any literature or any kind of written anything that
9 you're relying on in forming this opinion I am
10 entitled to read, so you and I can have a
11 conversation about that scientific research to see
12 if you're using it properly in determining your
13 opinion.  I think you're doing great and I like that
14 you're a straight shooter, so I don't want to come
15 across difficult.  But when you say "scientific", I
16 want to understand what you're relying on, so I can
17 go and read that article and say, oh, this is where
18 it says that.
19        So I am going to go back into your
20 testimony and tell Mr. Holober for you to provide me
21 whatever these written documents are.
22        Now, let me ask you a question,
23 Mr. Bradley.  If you can't provide me with these
24 articles or these written materials, would you agree
25 with me that then it's only based on your visual and

Page 62

1 your personal experiences in the field?
2     MR. HOLOBER: Calls for a legal
3  conclusion. Form. Harassing the witness.
4 BY MR. TIMLICHMAN:
5     Q    You can answer the question, Mr. Bradley.
6     A    Yes. I'll look into the documents. I
7 have researched before and seen scientific studies
8 on the corrosion and how much it eats away at metal
9 over time and I believe it was saltwater, so I will
10 look into that further. Any request, send it to
11 Evan and we'll provide any additional information.
12    Q    You agree with me that humidity and
13 saltwater are two accelerants of corrosion?
14    A    Yes.
15    Q    So something that's in humidity or in a
16 saltwater environment could have corroded over the
17 matter of a couple of weeks, while something let's
18 say in Tennessee with the same level of corrosion
19 could have happened over a matter of months or years
20 to get to the same result; that's a fair statement?
21    MR. HOLOBER: Form.
22    THE WITNESS: I'd say corrosion would be
23  quicker down there, but this amount of
24  corrosion did not happen in two weeks.
25

Page 63

1 BY MR. TIMLICHMAN:
2     Q   I understand, but that's based on your
3 opinion; right?
4     A   No.
5     Q   No, what is it based on, if it's not your
6 opinion?
7     A   I will provide scientific documentation.
8     MR. TIMLICHMAN: Okay. I -- the only
9  other question I have -- give me one second,
10  all right. Give me one second.
11 BY MR. TIMLICHMAN:
12    Q   I am just downloading your picture. I
13 have one more question from your original report
14 that I want to go through with you, so I apologize.
15 Looking back at Exhibit 5 -- no, no. I apologize.
16 This is from my report of the flashing membrane.
17 Let me just show this to you.
18    You would agree with me that the flashing
19 around where I'm pointing right now on the top right
20 of the picture and the bottom left of the picture,
21 that looks like it's in pretty good shape. It's
22 white, no staining, correct, no discoloration in it
23 whatsoever. Would you agree with that?
24    MR. HOLOBER: Form.
25    THE WITNESS: I believe the white is the

Page 64

1     mortar. The only real membrane you could see
2     is the one pooled up in the top middle.
3 BY MR. TIMLICHMAN:
4     Q   Sure. What would you say the condition of
5 that that's pulled up? It looks like it's in pretty
6 decent shape aside from the fact that it's ripped
7 up, no?
8     A   It looks in poor condition now. I
9 would've liked to see it before that.
10    Q   You would agree with me that the mortar
11 set on top, aside from where I have it circled and
12 arrowed, is all white and not discolored?
13    A   The second on the white is white. The
14 bottom left is discolored or with rust.
15    Q   How dark would you say the staining is?
16    A   I don't know how to accurately say how
17 much.
18    Q   Based on your visual observation and
19 scientific methodology, you can't look at that
20 staining and tell me how long that water's been
21 hitting there?
22    A   Not stains on mortar.
23    Q   Why is it any different?
24    A   I don't know if I've seen a study on
25 stains on mortar. There's a lot of documented

Page 65

1 studies on wood and other items, but I would not be
2 able to give you an age based on that stain.
3     Q   I understand. You would agree with me
4 that there's a tear in the mortar here?
5     A   There's a crack in the mortar, yes.
6     Q   But you don't see any cracks over here, in
7 the upper right or in the bottom left?
8     A   I see a bunch of busted up pieces.
9     Q   Which are over the mortar, which is like
10 little debris, but you would agree that under those
11 busted-up pieces is a pretty intact mortar set;
12 isn't it?
13    A   A pretty small area there. Other areas I
14 don't see any cracking other than the areas busted
15 up, I guess.
16    Q   And you agree that there was no other
17 cracking in the tile that you observed? We had gone
18 through that in your observations initially.
19    A   I did not see a crack in that area in the
20 tile.
21    Q   And if the mortar underneath was cracking,
22 or there was some kind of cracking underneath, we
23 would tend to want -- we would tend to see that in
24 the tile above, wouldn't we, because it would
25 displace the tile?

17 (Pages 62 - 65)

Page 66

1    A   It depends on how severe the movement was.
2    Q   Okay?
3    A   It could be.  Could not.
4        MR. TIMLICHMAN:  All right.  Let me show
5   you what we are going to premark as Exhibit 7.
6   Madam Court Reporter, these are the only
7   exhibits I haven't sent you.
8        (Thereupon, Plaintiff's Exhibit 8 was
9   marked for identification.)
10       MR. TIMLICHMAN:  Let me share my screen.
11  These are your photos.
12  BY MR. TIMLICHMAN:
13   Q   I'm just curious.  You took some
14  additional infrared pictures.  Are you seeing those
15  on your screen?
16   A   No.  I know which ones you're referring
17  to.
18       MR. TIMLICHMAN:  Am I not sharing screen?
19  Oh, here we go.  Okay.
20       THE WITNESS:  Okay.
21  BY MR. TIMLICHMAN:
22   Q   So you sent me some pictures with some
23  infrared.  Why?  What are you showing me here?  Let
24  me ask you better.  What does the purple indicate?
25       MR. HOLOBER:  Form.

Page 67

1        THE WITNESS:  Purple indicates a cooler
2    temperature.
3   BY MR. TIMLICHMAN:
4    Q   What's the significance of that?
5    A   I took those in my study to try to
6   determine the cause of the water intrusion to see if
7   I saw any specific areas.
8    Q   Did you?
9    A   It was inconclusive based on the photos
10  that I took on the infrared section.
11   Q   Inconclusive as to what specifically
12  though, just so we are clear?
13   A   A specific point of water intrusion below.
14   Q   Understood.  So you were unable to
15  identify an area where there was piping coming in
16  from the piping side; is that a fair statement?
17   A   I didn't see specific areas that I can
18  conclude that.
19   Q   Was the floor in the -- the floor in the
20  patio, was it properly pitched?
21   A   For the most part, I did see a flat area,
22  but other areas were pitched towards that drain.
23   Q   Okay.  Do you think that that was the
24  cause of the leak, that there was a buildup of water
25  or anything like that because of the flat area?

Page 68

1    A   Not due to the pitch.  Probably due to the
2   quantity of rain.
3    Q   So you believe this was a rain-driven
4   event?
5    A   Precipitation, yes.  And others.
6    Q   And in your observation.  I'm not sure if
7   this is a mistake, but if we look on page 3 of 19 of
8   Exhibit 5, which is your report, you refer to stains
9   are in the plywood below the deck, and staining
10  continues down the concrete and onto the pavement.
11  The plywood ceiling moisture content reading is
12  30 percent.  Where did you see plywood?
13   A   Probably a photo -- not in the report
14  photos, but if you go to the -- all the photos we
15  sent you, the one ending in 1483.
16   Q   Let's see.  1483.  There you go.
17   A   If you blow that one up.  To me it looks
18  like plywood, based on that edge there's definitely
19  a wood grain, a raised area.
20   Q   Would you agree that that could be due to
21  the wood or plywood they would have put over the
22  concrete to form it?
23   A   Correct.  That is a possibility.  It could
24  be concrete with the woodgrain from the forms.
25       MR. TIMLICHMAN:  Okay.  Mr. Bradley, I

Page 69

1   want to thank you very much for your time here
2   today.  I appreciate all your answers.  I
3   appreciate your patience with me.  I hope that
4   I didn't say anything that would have offended
5   you in any way.  We appreciate the time you've
6   put on the case and it's a pleasure to have met
7   you.  I don't have any further questions today
8   from you.  And, Mr. Holober, if you want to ask
9   your witness questions, you may do so.
10       MR. HOLOBER:  No questions from me.
11       MR. TIMLICHMAN:  Okay.  This is the best
12  part of the depo.  Mr. Bradley, you get to
13  choose if you want to read or waive Ms. Santos'
14  work for accuracy.  Otherwise, you are excused.
15       THE WITNESS:  I definitely want to read
16  and sign before submitting.
17       (Thereupon, the taking of the deposition
18  was concluded at 11:34 a.m.)

18 (Pages 66 - 69)

Page 70

1  RE: LEIGH ROTHSCHILD VS. GREAT NORTHERN INSURANCE COMPANY
   DEPO OF: JEFFREY BRADLEY, P.E., CFEI, CVFI
2  TAKEN: July 11, 2022
3
4       EXCEPT FOR ANY CORRECTIONS
        MADE ON THE ERRATA SHEET BY
5       ME, I CERTIFY THIS IS A TRUE
        AND ACCURATE TRANSCRIPT.
6       FURTHER DEPONENT SAYETH NOT.
7       _____
        JEFFREY BRADLEY, P.E., CFEI, CVFI
8
   STATE OF FLORIDA    )
9                      ) SS:
   COUNTY OF MIAMI-DADE)
10
11      Sworn and subscribed to before me this
12      _____ day of _____, 2022.
13 PERSONALLY KNOWN _____ OR I.D._____
14      _____
        Notary Public in and for
15      the State of Florida at
        Large.
16
   My commission expires:
17
18
19
20
21
22
23
24
25

---

Page 71

1       ERRATA SHEET
2  RE: LEIGH ROTHSCHILD VS. GREAT NORTHERN INSURANCE COMPANY
   DEPO OF: JEFFREY BRADLEY, P.E., CFEI, CVFI
3  TAKEN: July 11, 2022       JOB: 5316721
4  DO NOT WRITE ON TRANSCRIPT, ENTER ANY CHANGES HERE
5  Page #| Line #| Change       | Reason
6  ____|____|_____|_____
7  ____|____|_____|_____
8  ____|____|_____|_____
9  ____|____|_____|_____
10 ____|____|_____|_____
11 ____|____|_____|_____
12 ____|____|_____|_____
13 ____|____|_____|_____
14 ____|____|_____|_____
15 ____|____|_____|_____
16 ____|____|_____|_____
17 ____|____|_____|_____
18 ____|____|_____|_____
19 ____|____|_____|_____
20 ____|____|_____|_____
21 State of Florida)
   County of    )
22
   Under penalties of perjury, I declare that I have
23 read by deposition transcript, and it is true and
   correct subject to any changes in form or
24 substance entered here.
   _____   _____
25 Date       JEFFREY BRADLEY, P.E., CFEI, CVFI

---

Page 72

1       CERTIFICATE OF OATH OF WITNESS
2
3  STATE OF FLORIDA    )
                       ) SS:
4  COUNTY OF MIAMI-DADE)
5
6       I, DIANA SANTOS, Notary Public in and for
7  the State of Florida at Large, certify that I
8  witness, JEFFREY BRADLEY, P.E., CFEI, CVFI,
9  personally appeared before me on July 11, 2022
10 and was duly sworn by me.
11      WITNESS my hand and official seal this
12 18th day of July, 2022.
13
14
15
16
17      _____
        DIANA SANTOS
        Notary Public, State of Florida
18      at Large
        Notary #HH156685
19      My commission expires: 7/21/2025
20
21
22
23
24
25

---

Page 73

1       REPORTER'S DEPOSITION CERTIFICATE
2
3       I, DIANA SANTOS, certify that I was
4  authorized to and did stenographically report the
5  deposition of JEFFREY BRADLEY, P.E., CFEI, CVFI, the
6  witness herein on July 11, 2022; that a review of
7  the transcript was requested; that the foregoing
8  pages numbered from 1 to 69 inclusive is a true and
9  complete record of my stenographic notes of the
10 deposition by said witness; and that this
11 computer-assisted transcript was prepared under my
12 supervision.
13      I further certify that I am not a
14 relative, employee, attorney or counsel of any of
15 the parties, nor am I a relative or employee of any
16 of the parties' attorney or counsel connected with
17 the action.
18      DATED this 18th day of July, 2022.
19
20
21
22
23
24      _____
        DIANA SANTOS
25

---

19 (Pages 70 - 73)

Page 74

1        VERITEXT FLORIDA, LLC
         ONE BISCAYNE TOWER
2    2. S. Biscayne Boulevard, Suite 2250
       Miami, Florida  33131
3       (305) 371-1884
4  July 18, 2022
5  JEFFREY BRADLEY, P.E., CFEI, CVFI
    c/o EVAN M. HOLOBER, ESQUIRE
6  COZEN O'CONNOR, P.A.
    200 S. Biscayne Blvd
7  Suite 4410
    Miami, Florida 33131-2303
8  Telephone: (786)871-3959
    Email:  Eholober@cozen.com
9
    RE: LEIGH ROTHSCHILD VS. GREAT NORTHERN INSURANCE COMPANY
10  DEPO OF: JEFFREY BRADLEY, P.E., CFEI, CVFI
    TAKEN : July 11, 2022
11  READ & SIGN BY:  August 15, 2022
12  Dear JEFFREY BRADLEY, P.E., CFEI, CVFI:
13  This letter is to advise you that the transcript
    of the deposition listed above is completed and
14  is awaiting reading and signing.
15  Please arrange to stop by our office at One Biscayne Tower,
    2 S. Biscayne Boulevard, Suite 2250, Miami, Florida to read
16  and sign the transcript.  Our office hours are from
      a.m. to 4:00 p.m. Monday through Friday.      8:00
17  Depending on the length of the transcript, you
    should allow yourself sufficient time.
18
    If the reading and signing has not been completed
19  prior to the referenced date, we shall conclude
    that you have waived the reading and signing of the
20  deposition transcript.
21  Your prompt attention to this matter is appreciated.
22  Sincerely,
23
    DIANA SANTOS
24
    cc: JOSEF TIMLICHMAN, ESQUIRE
25

Page 75

1        VERITEXT FLORIDA, LLC
         ONE BISCAYNE TOWER
2    2 S. BISCAYNE BOULEVARD, #2250
       Miami, Florida 33131
3       (305) 371-1884
4
5
    JOSEF TIMLICHMAN, ESQUIRE
6  JOSEF TIMLICHMAN LAW, PLLC
    18851 NE 29th Avenue
7  Suite 700
    Aventura, Florida 33180
8  Telephone: (305)748-3789
    E-mail: josef@lawnowfl.com
    RE: LEIGH ROTHSCHILD VS. GREAT NORTHERN INSURANCE COMPANY
10  DEPO OF: JEFFREY BRADLEY, P.E., CFEI, CVFI
    TAKEN : July 11, 2022
11
12
    Dear JOSEF TIMLICHMAN, ESQUIRE:
13
    The original transcript of the deposition listed
14  above was previously provided to your office. The
    witness did not waive reading and signing and was
15  duly notified to come in and read the transcript.
16  _____ Attached to this letter you will find a copy
    of the corrections made by the witness.
17    PLEASE ATTACH THEM TO YOUR COPY OF THE
      DEPOSITION SO IT WILL BE COMPLETE.
18
    _____ The witness made no corrections to transcript.
19
    _____ As of the above date, the witness has not come
20  in to read and sign the transcript.  Please
    attach this letter to the original transcript
21  so it will be complete.
22  Sincerely,1
23
    DIANA SANTOS
24
    cc:
25    EVAN M. HOLOBER, ESQUIRE

20 (Pages 74 - 75)

| & | 2 | | accepted  49:18 |
|---|---|---|---|
| **&**  74:11 | **2**  4:5 8:3,5 30:20 | **4:00**  74:16 | accredited  11:18 |
| **1** | 32:7 74:2,15 75:2 | **5** | accuracy  69:14 |
| **1**  4:3 6:9 7:1,5 | **20**  44:24 45:10 | **5**  3:5 4:10 17:2,3 | accurate  9:15 11:3 |
| 31:14 73:8 75:22 | **200**  2:9 74:6 | 19:13 47:2 52:3 | 22:2 31:13 50:23 |
| **1,000**  60:1 | **2009**  14:9 | 63:15 68:8 | 51:10 55:9 70:5 |
| **10**  4:8 | **2020**  25:3 26:6 | **5316721**  71:3 | accurately  64:16 |
| **10:05**  26:5 | 27:18 28:2 30:16 | **6** | acquired  15:2,17 |
| **10:12**  1:11 | 31:7 36:9 | **6**  4:11 21:15,16 | action  73:17 |
| **10th**  28:24 29:23 | **2021**  9:22 25:3 | 25:16 32:25 45:20 | active  17:12 |
| **11**  1:11 70:2 71:3 | **2022**  1:11 70:2,12 | **66**  4:14 | actual  21:2 47:9 |
| 72:9 73:6 74:10 | 71:3 72:9,12 73:6 | **69**  73:8 | 48:18 |
| 75:10 | 73:18 74:4,10,11 | **6th**  9:22,23 | additional  9:18 |
| **11:34**  1:11 69:18 | 75:10 | **7** | 24:25 36:12,14 |
| **11th**  28:24 29:3,19 | **20th**  26:1 | **7**  4:3,13 41:19 | 37:4 39:1 51:1,20 |
| 29:24 30:8 39:9 | **21**  4:11 | 45:22 52:3 66:5 | 57:7 62:11 66:14 |
| **12**  15:14,18 17:9 | **22**  45:25 51:9 | **7/21/2025**  72:19 | adjacent  38:21 |
| 27:5 41:18 | **2250**  74:2,15 75:2 | **700**  2:4 75:7 | advise  74:13 |
| **121**  5:25 | **23148**  1:3 5:25 | **748-3789**  2:5 75:8 | advisory  36:6 |
| **12th**  28:24 29:3,19 | **2494**  72:16 73:23 | **786**  2:10 74:8 | age  65:2 |
| 29:24 30:8 39:10 | **25th**  23:14,21 57:5 | **8** | agree  22:1 23:4 |
| **13**  28:24 | 57:8 | **8**  4:5,14 41:19 66:8 | 25:25 32:15 34:18 |
| **13th**  25:10 26:13 | **29th**  2:3 75:6 | **871-3959**  2:10 74:8 | 36:5 37:6,20 39:22 |
| 28:10,13 29:3,19 | **3** | **8th**  26:7 | 39:25 40:6 41:16 |
| 29:24 30:8 39:10 | **3**  4:6 8:23 9:1,11 | **9** | 42:9 43:13,16,19 |
| **1483**  68:15,16 | 68:7 | **9**  4:6 | 47:23 50:22 51:7 |
| **14th**  30:16,17 31:1 | **30**  18:7 53:19 68:12 | **9th**  25:10 26:6,13 | 53:13,24 54:3 55:8 |
| 31:4,7,11,12,13 | **305**  2:5 74:3 75:3,8 | 27:17 28:2,9 33:25 | 57:18 59:1,18,21 |
| 39:10 | **33131**  74:2 75:2 | 36:9 | 59:25 60:4,9 61:24 |
| **15**  39:1,1 74:11 | **33131-2303**  2:10 | **a** | 62:12 63:18,23 |
| **17**  4:10 | 74:7 | **a.m.**  1:11,11 26:5 | 64:10 65:3,10,16 |
| **18**  74:4 | **33180**  2:4 75:7 | 69:18 74:16 | 68:20 |
| **18851**  2:3 75:6 | **371-1884**  74:3 75:3 | able  13:23,24 18:3 | aida  23:16,18 |
| **18th**  72:12 73:18 | **4** | 26:10 49:22 51:4 | airport  34:16 |
| **19**  41:18 45:24 51:9 | **4**  4:8 10:22,25 | 58:21 65:2 | allied  4:13 45:16,20 |
| 52:4 68:7 | 11:16 30:11 | absent  40:4 | allow  5:16 6:11 |
| **1:21**  1:3 | **40**  56:8,10,12,15,19 | accelerants  62:13 | 74:17 |
| | **4410**  2:9 74:7 | accelerate  59:20 | amount  25:25 |
| | **45**  4:13 56:6 | accept  16:20 | 26:13 32:20 58:10 |
| | | | 62:23 |

**amounts**   26:11
**analysis**   24:7 35:17
**answer**   5:18 26:25
    29:22 37:14 44:6
    44:23 47:13 49:13
    62:5
**answered**   5:20
    26:23 32:11 37:12
**answers**   5:18 69:2
**anybody**   18:1
    43:25
**apart**   46:6,7
**apartment**   30:9
**apologize**   52:1
    63:14,15
**appearances**   2:1
**appeared**   72:9
**appreciate**   5:9 6:12
    10:18 16:12 69:2,3
    69:5
**appreciated**   74:21
**area**   14:2 29:8 30:3
    34:9,12 36:9,15
    38:21,22 39:2,3,5
    53:22,25 54:5,9,10
    65:13,19 67:15,21
    67:25 68:19
**areas**   7:11 38:10
    51:18 65:13,14
    67:7,17,22
**arrange**   74:15
**arrow**   31:15,16
**arrowed**   64:12
**article**   61:17
**articles**   58:14
    61:24
**aside**   29:16,25
    32:15 64:6,11
**asked**   5:21 24:10
    24:25 26:23 32:11
    37:12

**asking**   9:14 13:23
    18:8 23:25 26:15
    26:18 30:25 50:13
**assisted**   73:11
**assume**   5:19 8:12
    44:13,25 54:19
**assumed**   42:13
    54:16
**assuming**   44:3
**assumption**   42:10
    42:12,15 45:8,9
    54:18
**atlantic**   31:17
**attach**   75:17,20
**attached**   75:16
**attention**   74:21
**attorney**   2:6,11
    20:14 58:17 73:14
    73:16
**attorneys**   16:21
    20:18
**august**   74:11
**authorized**   73:4
**auto**   20:9
**automotive**   11:12
**available**   16:23
    34:20 56:2
**aventura**   2:4 75:7
**avenue**   2:3 75:6
**awaiting**   74:14
**aware**   8:8 10:12
    18:10,18 54:23

**b**

**back**   16:6 19:13
    26:11 32:24 40:21
    46:11 52:2,2,3
    60:15 61:6,19
    63:15
**background**   10:20
    11:6 13:10 16:20
    20:25 33:9 35:16

**badger**   51:21
**bar**   36:21
**base**   16:14
**based**   14:1,18
    36:16 37:10 42:10
    42:18,19,20,21
    44:22 49:21 50:6
    50:16 52:5 57:19
    60:11 61:25 63:2,5
    64:18 65:2 67:9
    68:18
**basic**   21:13
**basically**   11:10
    12:5,5,19 15:17
    20:15,20 25:24
    30:11 38:20,21,25
    42:2 59:15
**basing**   14:22 59:9
**basis**   30:4
**bay**   60:1
**behalf**   1:21
**believe**   10:22 17:2
    17:20 20:14 29:5
    32:23 37:15 39:1
    43:12 45:20 57:17
    62:9 63:25 68:3
**beneficial**   6:6
**benefit**   40:22 45:15
    47:7 56:22
**best**   48:10,10 51:9
    69:11
**bet**   48:2,3
**better**   28:4 37:19
    50:25 66:24
**big**   45:14
**bigger**   19:19
**biscayne**   2:9 74:1,2
    74:6,15,15 75:1,2
**bit**   10:19 13:15
    38:18

**block**   39:7
**blocking**   49:23
**blow**   68:17
**blown**   42:1
**blvd**   2:9 74:6
**borders**   38:1
**bottom**   63:20 64:14
    65:7
**boulevard**   74:2,15
    75:2
**box**   52:6 53:2,17
    57:1
**bradley**   1:14 3:4
    5:2,8 6:1 7:4 10:4
    10:20 18:9 21:4,23
    22:2 23:19 24:6
    25:17 26:18,25
    29:9 32:9 36:19
    37:14 39:22 40:14
    41:12,20 42:10
    43:7 47:6 49:6,10
    52:9 53:8 55:15
    56:17 58:7 59:16
    61:3,23 62:5 68:25
    69:12 70:1,7 71:2
    71:25 72:8 73:5
    74:5,10,12 75:10
**bradley's**   4:8
**break**   29:13 34:25
    50:5
**brief**   22:14
**broad**   14:3
**broken**   47:25
**brought**   23:22
**brown**   13:16
**building**   31:22 55:3
    55:10 56:1,6,9,18
    56:19
**buildings**   12:19,21
**buildup**   67:24

bunch 22:6,10 65:8
busted 65:8,11,14
buyers 16:16

**c**

c 74:5
calculate 39:12
call 37:4
called 5:3 55:20
  56:15
calling 30:25
calls 62:2
capacity 15:21
capture 5:15
care 49:19,20
career 13:15
carrier 17:19
case 1:3 5:25 10:5
  19:4 20:7,10 34:4
  49:11 53:2 55:11
  69:6
cases 17:9 19:16
  46:18,23
casual 20:10
catholmites 53:21
cause 1:25 8:18
  10:6,9,13 14:20
  16:2 22:18,25 24:2
  24:3 40:2,8,24 42:6
  57:4,12,14 67:6,24
cc 74:24 75:24
ceiling 52:5,7 53:20
  68:11
cement 52:6
centerline 31:25
certain 42:4 43:11
  53:4
certainly 18:23
certificate 72:1
  73:1
certification 33:12

certify 70:5 72:7
  73:3,13
cfei 70:1,7 71:2,25
  72:8 73:5 74:5,10
  74:12 75:10
change 71:5
changed 7:6
changes 71:4,23
channel 30:24
check 10:3
choose 69:13
chose 46:16
chubb 17:20,21,23
  18:10
circled 64:11
circumstances 21:6
  21:13 40:13
clarity 19:4
class 11:9
classes 15:15,16
classroom 15:11
clear 10:4 67:12
client 19:3,3
close 29:6 60:2,3
come 35:25 41:21
  48:25 49:8 50:17
  52:13 61:14 75:15
  75:19
comes 16:9 36:1
coming 35:1,3
  37:19 41:5 50:14
  50:21 54:7 56:17
  58:19 67:15
commercial 19:23
commission 70:16
  72:19
companies 16:15
  16:21 19:10
company 1:8 5:24
  19:6,18,20 70:1
  71:2 74:9 75:9

company's 8:9
compared 24:5
complain 44:1
complete 5:18 17:7
  73:9 75:17,21
completed 74:13,18
complex 31:22
computer 73:11
compuweather
  33:2,12
concentration 13:1
conclude 67:18
  74:19
concluded 69:18
conclusion 40:20
  40:20,23 43:11
  50:16 52:1,3,4 62:3
conclusions 35:25
concrete 68:10,22
  68:24
condition 47:9
  56:18 64:4,8
confirmation 49:16
connected 73:16
considered 25:7
construction 12:21
consumed 58:1,10
consumption 59:15
contact 46:8
content 68:11
contents 25:22
continue 48:21
continued 15:16
continues 68:10
continuing 15:15
conversation 5:16
  22:24 61:11
cooler 67:1
copy 9:15 21:22
  25:16 75:16,17

correct 10:10 12:12
  13:21 14:10,14
  21:4,22,23 22:20
  23:2 28:24 31:2,19
  33:3 34:22 35:7,12
  35:18 36:1,2 38:16
  41:1 42:16,19,22
  42:23 43:1 44:15
  47:11,20,22 50:2
  51:5,12 57:23 61:1
  63:22 68:23 71:23
corrections 70:4
  75:16,18
correctly 45:1
correlated 23:9
corroded 62:16
corrodes 59:19,22
corrosion 52:5,23
  53:3,3,4,17 57:1,22
  58:11,20 59:3
  60:10,16 62:8,13
  62:18,22,24
cost 10:8,11
counsel 7:14 10:24
  73:14,16
county 70:9 71:21
  72:4
couple 62:17
court 1:1 5:13,15
  20:19 66:6
covered 41:14
cozen 2:8 74:6
cozen.com 2:11
  74:8
crack 65:5,19
cracking 65:14,17
  65:21,22
cracks 37:23,24
  38:4,10,24 42:2
  65:6

created 42:20
44:11
cumulative 30:11
curiosity 18:16
curious 56:21
66:13
customer 16:14
cut 9:6,7
cv 1:3 5:25
cvfi 70:1,7 71:2,25
72:8 73:5 74:5,10
74:12 75:10

**d**

dade 70:9 72:4
damage 8:18 19:25
34:6 42:1,1,2,21
50:18,18
damaged 43:15
damaging 21:11
dark 59:11 64:15
darker 59:12
data 28:20,22
29:17 32:22 34:20
34:21,23 35:25
date 7:6 9:23 10:1
27:25 31:4 34:9,12
35:5,6 71:25 74:19
75:19
dated 73:18
dates 25:4 26:10,11
29:7,17 32:19
day 22:12 31:7,11
31:12 32:6,17
34:17 49:20 51:3
51:11 70:12 72:12
73:18
days 24:5 26:7 31:9
dear 74:12 75:12
debate 36:22
debris 42:2 65:10

decent 64:6
deck 37:24 38:1,4
40:24 68:9
declare 71:22
deeper 26:2
defendant 1:9 2:11
19:21 20:6
defense 19:3,6
deficiencies 40:25
41:9
definitely 20:22
39:14 68:18 69:15
definitively 48:20
degree 11:20 38:11
department 7:18
8:1 22:11
depending 38:11
41:6 74:17
depends 45:13,14
52:20 66:1
depiction 51:10
depo 8:20 69:12
70:1 71:2 74:10
75:10
deponent 70:6
deposed 6:2
deposition 1:14,24
4:3 5:14 7:5 69:17
71:23 73:1,5,10
74:13,20 75:13,17
description 4:2
design 11:8,9,9
12:2,5,9
designed 55:4
designing 12:20
destroyed 55:17
destructive 46:12
47:14 51:2,8
destructively 51:16
determination
30:25 35:15 41:21

50:15 58:20 59:9
determinations
34:19
determine 10:8,13
14:20 16:2 22:18
23:5,25 24:2 29:2
29:18,23 34:11
47:9,16 52:11,18
52:24 57:1,4,11,13
57:21 59:7 67:6
determining 55:16
59:2,3 60:10 61:12
diana 1:22 72:6,17
73:3,24 74:23
75:23
different 19:24
28:15 48:5 49:8
53:25 54:4 64:23
difficult 61:15
direct 3:5 5:6 53:18
directions 53:20
disagree 33:25
37:17
disclosure 4:5 8:4
discoloration 63:22
discolored 64:12
64:14
discovery 58:16
discuss 5:23
displace 65:25
disrepairs 52:6
distance 60:3
distinction 29:11
district 1:1,1
division 1:2
divorce 14:5
document 7:7 8:11
8:15 10:23 16:19
18:13 56:16
documentation
17:25 19:11,12

63:7
documented 64:25
documents 7:21,22
16:6 19:12 47:4
61:21 62:6
doing 5:13 12:21
13:2,17,19 14:15
14:16,17 15:25
61:13
donan 4:6 9:12
11:10 14:8,16 15:3
15:4,16,18,20 16:4
16:13,17,20
door 61:4
downloading 63:12
drain 39:2,7 40:1,5
40:18 53:18,20,21
53:23 54:2,6,15,18
54:19 55:12,13
67:22
drained 54:16,17
54:20
drainpipe 54:19
drains 53:25 54:13
drawing 12:23 55:9
drawings 12:21,22
13:5,7,8 14:16,17
14:19 55:3 56:1,4,7
driven 68:3
duces 4:3 7:5
ductwork 12:20
due 31:2 58:10 68:1
68:1,20
duff 13:16
duly 5:3 72:10
75:15
duration 59:7
60:21,23

**e**

e  2:5 75:8
easily  58:4
east  32:1
eat  53:4
eaten  53:5
eats  62:8
edge  68:18
education  14:24
  15:15,16 35:16
educational  58:14
eholober  2:11 74:8
eighths  39:20,21,22
  39:25 40:8
electric  53:2
electrical  52:6
  53:17
eliminating  43:8
elimination  42:24
  49:6,17,21 50:7,20
email  2:11 74:8
employee  73:14,15
engineer  4:13 8:10
  11:17,22,23,24,25
  13:23 23:5 36:10
  36:24 45:20 46:17
  48:1 52:25 56:21
engineering  11:7,8
  11:19,20,21 13:12
  13:16,22 14:3,6,17
  14:20 24:13,14
  42:17 43:1,3,6 45:8
  48:16,25 49:18
  55:3 58:18
engineering's
  45:16
engineers  12:4
  15:13
enter  71:4
entered  71:24

entire  53:20
entitled  61:10
environment  62:16
errata  70:4 71:1
especially  60:7
esquire  2:2,8 74:5
  74:24 75:5,12,25
estimate  39:13
eta  23:10,21,22
  24:1 25:1,7 26:5,17
  27:18 28:3,3,14
  29:4,7,20,25 30:8
  30:18,21 31:2
  33:24 36:7,8
evan  2:8 7:19 58:23
  62:11 74:5 75:25
event  21:7 44:18,18
  68:4
everybody  9:7
evidence  32:2
  44:12,20
exact  18:13 39:14
  60:2
exactly  24:12,23
  34:7
exam  11:21,21,23
examination  3:5
  5:6
examined  5:4
example  28:13
  60:14
excused  69:14
exhibit  4:3,5,6,8,10
  4:11,13,14 6:9 7:1
  7:4 8:3,5,22,23 9:1
  9:11 10:22,25
  11:15,16 17:1,2,3
  19:13 21:15,16
  25:16 32:25 45:19
  45:22 52:3 63:15
  66:5,8 68:8

exhibits  4:1 6:8
  66:7
experience  11:7,8
  12:17 13:11,20
  14:2,12,15,25 15:2
  15:14 19:14 38:2
  48:12 51:4 52:15
  57:20 60:12,25
experiences  14:23
  62:1
expert  4:5 8:4,9
  14:7 15:21,25
  16:16 17:8 25:17
  25:23 26:9,21 27:3
  27:17,23 28:1
  32:25 33:1,23 36:3
  36:7,10 37:20
  49:10 53:8 56:17
  58:12
expertise  59:2
experts  27:11 33:3
expires  70:16 72:19
explain  50:11
exposed  12:18
eyes  51:4

**f**

fact  42:19,20 64:6
factors  42:22
failure  16:3
failures  11:11
fair  13:10 18:19
  36:5 62:20 67:16
falls  28:23
familiar  8:24 9:25
  18:21
far  7:25 21:24
  32:18
fast  59:19
federal  20:19
feet  60:1

fell  26:14 29:2
  30:17
field  12:1 13:25,25
  14:7 15:13 48:12
  57:20 60:12,25
  62:1
fields  15:17
figure  30:20 31:14
  32:7 36:25 44:10
  44:11
figures  36:24
figuring  39:15
filed  1:24
find  51:24 56:7
  75:16
finish  5:17
fire  13:17
firm  32:23 47:4
firmly  47:6
firms  16:14
first  5:3 6:1,8 15:12
  22:16,16 25:21
  50:6 52:9
five  39:20,21,22,25
  40:8
fixtures  13:9
flashing  41:1,4,13
  41:22 42:5,14
  43:12,14,17 44:3
  44:13 45:1,12 46:3
  47:10,15 49:23
  51:11,16,18 55:16
  63:16,18
flat  67:21,25
flood  39:4 40:2,8
floor  39:2 40:18
  47:10,21 54:2,9
  67:19,19
flooring  48:21
florida  1:1,23 2:4
  2:10 5:24 29:6

30:13 46:18,23,25
47:1,3 56:14,18
60:5 70:8,15 71:21
72:3,7,17 74:1,2,7
74:15 75:1,2,7
**follows** 5:5 53:13
**foregoing** 73:7
**forensic** 8:10 14:19
23:5 24:11,13,20
24:21 26:8 33:2
**form** 28:6 30:1
35:19 37:2,10,12
38:5 39:11 40:9
41:24 43:2,20 44:4
45:3 46:19 47:12
48:4,14,15,22
49:25 52:14 55:18
57:24 60:19 62:3
62:21 63:24 66:25
68:22 71:23
**formal** 27:7
**formed** 49:20
**forming** 58:15 61:9
**forms** 68:24
**forth** 35:2
**forward** 7:17,18
58:23,24
**found** 28:22
**foundational** 38:3
38:9
**four** 11:18,22 15:12
15:12 17:10,11
24:5 26:7
**fractures** 37:24
**freshwater** 54:7
**friday** 74:16
**front** 17:13
**frozen** 18:2
**fueled** 13:6
**fundamental** 11:20

**g**

**gaining** 12:17
**gaps** 38:24
**garage** 21:11 22:19
52:7 54:8,11 59:25
**generally** 12:11
**getting** 13:20 14:11
21:12
**give** 5:18,18 6:4
11:6 15:10 38:14
49:13 58:13 60:15
60:21 63:9,10 65:2
**given** 25:16 32:17
34:17 35:10 37:11
45:15 57:3
**giving** 30:11
**go** 6:11 7:11 9:24
16:8 17:14 22:4
26:11 37:22 57:6
57:16 59:11,13
61:6,17,19 63:14
66:19 68:14,16
**going** 5:14,19 6:8
7:9 8:2 10:21 11:14
16:25 19:13,14
21:14,15,19,20
32:8,24 34:2 35:4
45:18 46:12 50:24
52:3,19,25 55:10
61:19 66:5
**good** 6:4 46:8 48:3
63:21
**google** 32:16,22
**graduated** 11:19
**grain** 68:19
**graph** 32:4

**great** 1:7 5:24 8:9
61:13 70:1 71:2
74:9 75:9
**greater** 58:5
**ground** 5:12 6:6
**guess** 31:12 48:2
65:15
**guessing** 48:8
**guilty** 5:17
**gusts** 35:8
**guy** 36:23
**guys** 18:3

**h**

**hail** 41:25 42:21
50:18
**half** 39:19
**hand** 72:11
**handed** 20:16
**happen** 54:21
62:24
**happened** 51:20
60:16 62:19
**harassing** 55:22
62:3
**hard** 5:14 56:7
**he'll** 58:24
**headwinds** 35:7
**hear** 9:7 18:3,4,7
51:21
**hearsay** 45:4
**heater** 19:23,25
**heavy** 28:23 52:5
**help** 47:16 57:7
**hh156685** 72:18
**higher** 35:15
**hire** 16:22
**hired** 23:4 57:10
**hitting** 64:21
**hold** 29:13 49:1
**hole** 39:21 40:4,8
48:1

**holober** 2:8 9:6
18:2,6,20,20 26:23
28:6,11 30:1 32:11
35:19 37:2,12 38:5
39:11 40:9 41:24
43:2,20 44:4 45:3
46:19 47:12 48:4
48:14,22 49:25
52:14 55:18,22
57:24 58:18 60:19
61:20 62:2,21
63:24 66:25 69:8
69:10 74:5 75:25
**home** 16:16 38:16
**homeowner** 19:5
19:17
**homeowners** 16:21
19:9
**hope** 69:3
**hopefully** 5:10
**hopping** 32:16
**horizontal** 38:23
**hose** 38:21 39:5,18
39:18,19,23 40:1,7
41:5
**hosed** 38:22
**hours** 74:16
**housekeeping**
10:16
**how'd** 23:12
**humid** 60:4
**humidity** 59:18
62:12,15
**hurricane** 24:1
25:1,7 26:4 27:18
28:2 29:4,20,24
30:8,18 31:2 33:24
36:7 60:7
**hvac** 11:8 12:5,7,15
12:17,19,23 13:1,4
13:4,5,7,7,17 14:23

33:10
**hypotheses** 50:20
**hypothesis** 49:9
50:9,14,17

**i**

**i.d.** 70:13
**idea** 17:16 45:5
**identification** 4:1
7:2 8:6 9:2 11:1
17:4 21:17 45:23
66:9
**identify** 67:15
**ignorance** 13:24
**important** 56:16
**impossible** 40:7
47:8
**improper** 41:8
**improperly** 41:4
44:14,16 46:4
55:20
**inaudible** 38:12
**inch** 39:20
**inches** 39:20 53:19
**include** 32:5
**included** 32:6
**inclusive** 73:8
**inconclusive** 67:9
67:11
**incorrect** 59:6
**index** 3:1
**indicate** 66:24
**indicates** 67:1
**influence** 30:13
**influenced** 29:8
30:4
**information** 18:14
20:17,25 35:9,17
35:20 37:8,9,11,15
37:19 50:25 51:1
51:20 57:7 62:11

**infrared** 4:14 66:14
66:23 67:10
**initial** 57:13
**initially** 11:21
36:13 65:18
**initiated** 26:16
**inquiry** 7:11
**inspection** 14:18,20
56:8,10,12 57:19
60:11
**inspections** 11:11
16:17 56:15
**installation** 40:25
41:9
**installed** 41:4,23
42:15 43:18,21
44:14,17 45:1,12
46:4 55:20
**instance** 21:3
**insulation** 42:5
**insurance** 1:7 5:24
8:9 14:5 16:15,21
17:18 19:5,10,18
19:20 70:1 71:2
74:9 75:9
**intact** 65:11
**intrusion** 11:13
14:12,25 15:8 16:1
22:18,25 23:9 24:3
33:11 36:11 40:24
41:22 42:7 52:7
53:9 59:3 67:6,13
**intrusions** 11:11
**invited** 46:13
**invoice** 4:6 9:12,15
9:19,20,21 10:17
**invoiced** 9:17
**invoices** 9:18
**involved** 19:23
20:2 24:12

**involves** 50:13
**issue** 47:16
**issues** 22:5
**issuing** 28:19
**item** 60:24
**items** 7:15,18,19,21
10:12 16:3 20:16
65:1

**j**

**january** 9:22,23
**jeffrey** 1:14 3:4 4:8
5:2 70:1,7 71:2,25
72:8 73:5 74:5,10
74:12 75:10
**job** 27:8 52:15 71:3
**josef** 2:2,3,5 74:24
75:5,6,8,12
**judge** 20:19
**judgment** 48:10,11
**july** 1:11 70:2 71:3
72:9,12 73:6,18
74:4,10 75:10
**jump** 13:24

**k**

**keep** 7:9 18:17 19:1
20:22
**kind** 12:16,17
13:24 14:6,13,15
14:17 15:5,6,10
26:8 61:8 65:22
**know** 7:25 8:11 9:6
12:16 15:4 16:13
16:15 17:22 19:1,3
19:7 20:6 24:12,18
27:12,14 28:8,12
28:14 31:4 33:7
36:4,16 39:13,18
46:11 50:20 51:19
54:12,13 56:2,12
60:2,2,21 64:16,24

66:16
**knowing** 56:23
**knowledge** 9:17
14:1 15:3,17 44:5
**known** 70:13

**l**

**l** 1:14 3:4 4:8 5:2
**large** 1:23 23:14
70:15 72:7,18
**larger** 40:15,16,16
**law** 2:3 16:14 75:6
**lawnowfl.com** 2:5
75:8
**lawyer** 14:4,5,5,6
**layer** 40:25 41:3,13
**layout** 55:9
**leak** 41:7 43:19,22
44:10,24 45:14
54:10 57:8 67:24
**leaked** 21:10 41:5
44:17
**leaking** 44:2
**leaks** 43:18 45:10
**learning** 12:7,8
**left** 63:20 64:14
65:7
**legal** 58:17 62:2
**leigh** 1:4 5:23 70:1
71:2 74:9 75:9
**length** 74:17
**letter** 74:13 75:16
75:20
**level** 45:9 51:17
62:18
**levels** 59:4
**license** 13:25
**lifting** 50:23
**liked** 64:9
**limited** 20:12,13,14
**line** 31:21 32:1,1,5
36:13 71:5

**lines** 54:6
**listed** 8:8 74:13
75:13
**literature** 58:19
61:8
**litigation** 4:10 7:17
7:25 16:5,9 17:7,8
17:12,15 19:14
22:11
**little** 10:19 13:15
16:7 19:18 23:14
38:18 65:10
**lived** 44:23
**llc** 74:1 75:1
**local** 30:24
**location** 9:22 25:12
31:15
**long** 5:11 10:1 14:7
22:15 50:3 52:8,11
57:1,21 59:2 64:20
**longer** 28:3 36:8,9
**look** 16:8 25:19
26:12 41:19 46:3,7
46:8 52:10,24
54:22,25 55:2 56:1
56:8 58:8 62:6,10
64:19 68:7
**looked** 17:20 25:2
30:2 51:11 54:14
56:9,16
**looking** 16:1,15
25:4 29:16,25
34:19 37:7 41:17
41:18,19 45:15,24
49:16 51:9 55:15
63:15
**looks** 9:14 11:4,5
13:16 21:22 22:2
31:17 36:15 41:13
63:21 64:5,8 68:17

**loss** 10:1,6,9,14
16:2 23:13 24:3
34:10,12 57:4,5,14
59:7
**losses** 11:12
**lost** 50:4
**lot** 11:12 15:17
23:23,23 24:4
46:11 53:25 54:4
59:10,13 64:25
**lots** 54:10

## m

**m** 2:8 74:5 75:25
**madam** 66:6
**mail** 2:5 75:8
**majority** 25:2
**making** 34:19
**managers** 15:13
**marked** 6:9 7:2,4
8:3,6,23 9:2,11
10:22 11:1,16 17:4
21:17 25:16 32:25
45:19,23 66:9
**material** 58:15
60:14
**materials** 61:24
**matter** 8:10 60:23
62:17,19 74:21
**matters** 10:16
**mean** 41:8 45:13
55:12
**means** 22:24
**measure** 39:19
58:10
**mechanical** 14:2
**membrane** 42:5
44:13 45:12 47:15
47:25 49:23 63:16
64:1
**mention** 51:24

**mentioned** 13:14
23:20 26:6
**mentor** 15:6
**met** 38:23 69:6
**metal** 57:22 58:1
58:10 59:14 62:8
**metals** 53:4
**meteorologist**
27:15
**meteorologists**
27:13
**meters** 60:20
**method** 48:25 49:3
49:4,5,7 50:10,11
50:12
**methodology** 35:2
43:1,4,6 48:19
49:15,17 64:19
**methods** 50:8
**mgc** 1:3 5:25
**miami** 1:2 2:10
70:9 72:4 74:2,7,15
75:2
**middle** 46:10 64:2
**mine** 18:24 36:17
**minutes** 39:1,2
**mislead** 16:11,24
**misstates** 47:12
48:22
**mistake** 68:7
**moisture** 60:13
68:11
**monday** 1:11 26:5
74:16
**month** 25:2
**months** 52:19,25
58:21 60:17 62:19
**morning** 5:9,11
**mortar** 38:24 40:18
64:1,10,22,25 65:4
65:5,9,11,21

**movement** 66:1
**moving** 29:5
**multiple** 19:22

## n

**name** 18:21,24
**nashville** 20:19
**national** 32:22
34:14,16 35:4,21
35:25 37:16
**ne** 2:3 75:6
**near** 39:2
**necessarily** 23:3
37:21
**need** 16:16 55:13
**needed** 15:23,24
47:1
**never** 24:21 33:14
33:17 43:25 44:24
**newly** 15:2
**normally** 46:17,23
46:24
**north** 31:25 37:25
**northern** 1:7 5:24
8:9 70:1 71:2 74:9
75:9
**notary** 1:22 70:14
72:6,17,18
**notes** 73:9
**notice** 1:24 4:5 8:4
10:17
**notified** 75:15
**november** 10:2
23:14 25:3,6,10,10
26:1,6,7,13,13
27:17 28:2,9,13,23
29:3,19,23 30:8,16
30:17 31:1,4,7,11
31:12,13 33:25
36:9 57:5,8
**number** 4:2 5:25
16:10 17:25 18:13

**numbered** 73:8
**numbers** 16:23
47:4
**numerous** 15:15

**o**

**o** 74:5
**o'connor** 2:8 74:6
**oath** 5:22 72:1
**object** 41:24
**observation** 47:15
60:24 64:18 68:6
**observations** 37:23
41:15 48:11 65:18
**observe** 41:25
49:22 58:21
**observed** 31:7 38:3
53:17 65:17
**obtained** 35:22
**obvious** 55:12,15
55:21
**obviously** 5:22 7:6
46:10
**occurred** 52:8,12
59:3
**ocean** 31:17 60:1
**offended** 69:4
**office** 18:1,17 74:15
74:16 75:14
**official** 72:11
**oh** 51:25 61:17
66:19
**okay** 6:4 7:20 8:14
10:15 12:16 16:12
19:1 20:23 21:6,14
21:21 22:13 24:16
26:18 29:21 30:7
31:18 32:24 33:21
35:9 36:20 37:22
44:2,3 58:12 59:8
63:8 66:2,19,20
67:23 68:25 69:11

**old** 56:6
**once** 13:22
**ones** 66:16
**online** 15:16
**opening** 42:20
44:11 61:4
**openings** 40:15,16
40:17 42:3 43:9
**opinion** 19:8,9
22:25 23:17 25:22
26:9,22 27:4 28:4,5
32:18 35:3 36:17
37:10,18 41:12,16
42:4,13,14,16,17
45:11 48:16,25
49:21 50:6 56:17
57:19 58:13,15
61:9,13 63:3,6
**opinions** 16:16
32:10 35:2 48:6
**original** 61:7 63:13
75:13,20
**originated** 23:17
**outdoor** 21:10
**outside** 10:8 22:25
23:1 25:1 44:4
57:16,18
**overwhelmed**
46:21

**p**

**p.a.** 2:8 74:6
**p.e.** 70:1,7 71:2,25
72:8 73:5 74:5,10
74:12 75:10
**p.m.** 74:16
**page** 3:3 4:2 30:10
30:11 41:18 45:24
51:9 52:3 68:7 71:5
**pages** 73:8
**paper** 20:20

**paperwork** 23:13
**paragraph** 22:17
**parking** 22:19
**part** 7:10 16:17
67:21 69:12
**particular** 17:17
**parties** 6:6 19:22
73:15,16
**partly** 21:11
**party** 35:10 37:8
**pass** 11:20,23
**passed** 11:21
**path** 26:12 31:18
31:22 32:19,20
36:16 53:14
**patience** 69:3
**patio** 21:10 22:19
38:23 54:14,15,17
55:14 67:20
**pattern** 28:15
**patterns** 29:20,23
**pavement** 68:10
**peer** 58:14
**penalties** 71:22
**people** 27:10,11
**percent** 47:2 68:12
**percentage** 16:4
17:22,25 18:9 19:2
**percentages** 19:8,9
**performed** 38:20
**peril** 42:20 44:11
**period** 32:7,21 52:8
57:21
**perjury** 71:22
**permit** 56:4
**permits** 56:9
**personal** 60:12,25
62:1
**personally** 70:13
72:9

**peterbilt** 13:18
**phonetic** 23:16
**photo** 68:13
**photograph** 41:19
**photos** 4:14 22:12
41:20 66:11 67:9
68:14,14
**picture** 32:3 46:3
51:8 63:12,20,20
**pictures** 22:6,7,8
22:10 38:15 39:23
66:14,22
**piece** 20:20
**pieces** 65:8,11
**pipe** 54:13,20
**pipes** 53:25 54:11
**piping** 13:6 40:5
54:4 67:15,16
**pitch** 68:1
**pitched** 67:20,22
**place** 44:24 57:2,23
**plaintiff** 1:5,21 2:6
5:23 19:2,5
**plaintiff's** 4:1 7:1
8:5,18 9:1 10:25
17:3 21:16 45:22
66:8
**plays** 59:18,21
**plaza** 38:1 40:24
**please** 74:15 75:17
75:20
**pleasure** 69:6
**pllc** 2:3 75:6
**plumbing** 11:9,10
12:6,7,15,18,20,22
13:3,4,8,8,11,17
14:23 33:10 53:10
54:5,22,23 55:2,10
**plywood** 51:24,25
68:9,11,12,18,21

**point** 31:21 48:9
 49:20 67:13
**pointed** 47:24
**pointing** 31:16
 63:19
**pooled** 64:2
**poor** 64:8
**portion** 5:15
**possibility** 68:23
**possible** 38:6,11
 39:4 40:10,14 41:6
 41:10,12 45:13
**poured** 38:25 40:1
**practice** 14:2
**precipitation** 27:24
 28:20,22 29:17,25
 30:2,12,14 31:8
 32:6,17,21 68:5
**premark** 66:5
**premarked** 6:7
 17:1 21:15
**prepared** 8:17 21:3
 73:11
**pretty** 14:3 29:6
 32:23 37:16 46:8
 50:3 55:11 60:4
 63:21 64:5 65:11
 65:13
**previous** 43:18
**previously** 6:9 8:3
 9:5,11 10:22 11:15
 25:15 32:25 43:14
 45:19 75:14
**primarily** 10:13
 53:2 54:14
**prior** 31:12 44:1,17
 48:22 74:19
**probable** 42:6
 50:21
**probably** 9:23 12:2
 13:3 15:14 16:8

23:15 25:6 39:7
 53:19 68:1,13
**problem** 14:21
 44:24
**process** 42:24 49:6
 49:17,21 50:6,19
**product** 30:17
**professional** 4:8
 11:4,22,23,24
**proficient** 15:7
**profile** 4:8 11:4
**project** 15:13 16:8
 24:8 46:20
**projects** 16:20
 17:14,21 27:2,6
 46:25
**prompt** 74:21
**properly** 41:22
 42:15 43:17,22
 61:12 67:20
**property** 8:18
 20:10 31:15
**proposition** 23:22
**protection** 13:18
**proven** 48:19 60:13
**provide** 7:14 20:15
 51:1,20 57:6 58:18
 61:20,23 62:11
 63:7
**provided** 10:23
 16:25 17:6 19:14
 37:8 75:14
**public** 1:22 34:20
 56:5 70:14 72:6,17
**pull** 39:24 40:21
**pulled** 30:15 46:11
 64:5
**purple** 66:24 67:1
**purpose** 22:17 57:9
 57:10,11

**purposes** 33:19
 39:24 41:17 45:2
**pursuant** 1:23
**push** 39:8
**put** 31:15 68:21
 69:6
**putting** 35:2
**pvc** 40:4 48:2

## q

**qualification** 52:10
 52:13
**qualifications** 29:1
 29:10 33:5
**qualified** 24:7,11
 24:14,19,22 25:13
 25:22 26:8,21 27:3
 27:19,22 32:9,13
 35:24
**quantity** 23:15
 68:2
**question** 5:20,20
 6:1 9:8,10 11:14
 17:17 22:16 23:19
 24:16 25:21 26:7
 29:9 36:18 38:13
 39:17 41:11 42:11
 44:7,16 50:3,14
 51:12,23 52:9 53:7
 55:25 56:24 59:16
 61:22 62:5 63:9,13
**questions** 20:18
 22:14 61:5 69:7,9
 69:10
**quick** 5:12 11:6
 19:15 21:25
**quicker** 62:23
**quickly** 21:14
**quite** 22:13 57:6

## r

**rain** 23:14,20,23
 25:11,25 26:7,10
 26:14 28:8,12,23
 29:2 30:16 39:9
 68:2,3
**rainbands** 31:25
 32:4
**rainfall** 30:21 31:1
**raining** 31:3
**raised** 68:19
**rate** 59:15
**rates** 53:3
**raw** 35:24
**ray** 47:19
**reaching** 50:15
**read** 20:16,17,20
 33:8 61:10,17
 69:13,15 71:23
 74:11,15 75:15,20
**reader** 60:14
**reading** 60:15
 68:11 74:14,18,19
 75:14
**real** 14:19 19:15
 48:18 64:1
**really** 14:11 36:10
 57:20
**reason** 33:25 36:10
 71:5
**rebut** 27:22 28:17
**rebutting** 36:11
**recall** 18:22 19:16
 21:6,9,10 33:16,20
**recertify** 56:19
**record** 41:17 56:5
 73:9
**recordkeeping**
 19:7
**records** 18:17

**[recreate - sent]**                                                                                                           Page 86

**recreate**  39:9
**red**  31:21
**refer**  68:8
**referenced**  74:19
**referring**  66:16
**reflection**  11:3 51:9
**region**  28:4 33:24
**related**  12:23 16:5
  42:3 43:8
**relative**  73:14,15
**relaying**  35:11 37:9
**relevant**  7:18
**reliable**  37:16
**rely**  51:4 58:6,15
**relying**  23:21 32:3
  35:11 37:9 41:21
  42:25 58:19 61:9
  61:16
**remember**  61:3
**remotely**  5:14
**removed**  51:16
**removing**  46:9
**repair**  10:8,12
**repairs**  11:12 53:22
  53:22
**repeatedly**  52:7
**rephrase**  23:24
  44:7
**report**  4:11,13 16:9
  20:13,15 21:2,3,15
  21:19,21,23 22:1
  22:22 23:1 24:11
  24:13,21,23,24
  25:17,19,23,24
  26:4 28:2,19,21
  29:14 30:7,9 32:4,5
  33:1,1,17,23 34:21
  35:11 36:7,14,23
  41:18 45:16,21
  51:23 63:13,16
  68:8,13 73:4

**reported**  10:2
  23:13 34:6,9,12
  57:5
**reporter**  1:22 5:13
  5:15 66:6
**reporter's**  73:1
**reports**  24:7,15,20
  34:24
**repot**  23:8
**represented**  19:17
  19:17 20:1
**request**  55:6 57:15
  58:23 61:7 62:10
**requested**  73:7
**required**  58:13
**research**  24:8,14
  24:23,24,25 27:1
  27:20 28:8,17,18
  29:1,7,10,16,21,22
  34:14,23 35:1
  36:12,14 37:4,7
  55:13 61:2,3,6,7,11
**researched**  27:5
  28:20 62:7
**researching**  32:16
**residence**  26:14
**resistance**  53:14
**respectfully**  24:6
  29:9 32:9 37:18
**responded**  18:12
**responding**  5:4
  7:10
**responses**  58:17
**result**  62:20
**retained**  19:21
  37:15
**retract**  34:2
**review**  73:6
**reviewed**  25:24
  36:13 58:14

**right**  5:10 6:7 15:1
  18:25 22:13 23:6
  23:10 30:20,22
  31:6 33:6,10 38:21
  42:21 43:23 44:14
  45:12 47:19,21
  48:3,8,10,13,21
  50:7 51:21 53:8,11
  54:1,5,7,18 55:10
  57:2,11 60:17,18
  63:3,10,19,19 65:7
  66:4
**ripped**  46:5,7 51:17
  64:6
**role**  59:18,22
**roller**  20:9 34:5
**roof**  11:11
**roofs**  11:12
**rot**  59:14 60:10
**rothschild**  1:4 5:23
  43:25 44:23,25
  70:1 71:2 74:9 75:9
**rots**  59:23
**rules**  5:12 6:6
**rust**  64:14
**rusts**  59:19,22

**s**

**s**  2:9 74:2,6,15 75:2
**safe**  44:22,25
**saltwater**  59:21
  62:9,13,16
**santos**  1:22 6:10
  69:13 72:6,17 73:3
  73:24 74:23 75:23
**saw**  7:8 22:7 42:3
  42:18,21 54:10
  67:7
**sayeth**  70:6
**saying**  9:10 17:25
  25:23 27:23 31:3
  35:6 60:15

**says**  28:2 30:20
  31:6,8,10 33:2
  61:18
**scan**  21:25
**scene**  38:14
**schematics**  54:21
  54:22,24
**scientific**  35:14
  42:25 48:24 49:3,4
  49:5,7 50:8,10,11
  50:12,13 61:2,6,7
  61:11,15 62:7 63:7
  64:19
**scope**  10:5 14:3
  22:22 23:1 34:18
  44:4 56:25 57:2,3
  57:13,16 59:4
**screen**  6:11 20:23
  66:10,15,18
**seal**  72:11
**season**  60:7
**second**  19:21 38:14
  52:1,2,4 63:9,10
  64:13
**seconds**  18:7
**section**  67:10
**see**  26:12 31:24
  36:13 38:10 39:23
  47:16,21 54:21
  55:17 56:10 60:3
  61:11 64:1,9 65:6,8
  65:14,19,23 67:6
  67:17,21 68:12,16
**seeing**  40:22 47:7
  50:24 66:14
**seen**  7:6 8:11,14
  19:12 51:25 58:9,9
  62:7 64:24
**send**  62:10
**sent**  7:23 22:9,12
  66:7,22 68:15

separate  12:24
  13:5
separation  37:25
served  37:19
service  32:22 34:15
  35:5,21 36:1,6
  37:16
servicing  16:18
set  5:12 64:11
  65:11
setting  19:4
settling  38:2,3,9,9
seven  31:7,9,11,12
  32:6
severe  66:1
severity  41:6,8
shape  63:21 64:6
share  66:10
sharing  6:11 66:18
sheet  70:4 71:1
shooter  36:19
  61:14
shorter  6:5
shorthand  1:22
show  6:8 8:2,22
  10:21 16:25 19:15
  21:14,19 25:15
  30:7,10 39:24
  45:18 51:18 52:2
  57:25 63:17 66:4
showing  9:4,10
  15:7 18:13 28:1
  66:23
shows  32:4
side  67:16
sides  53:23
sign  69:16 74:11,16
  75:20
signature  72:16
  73:23

significance  67:4
significant  25:11
  28:8
significantly  24:4
signing  74:14,18,19
  75:14
simply  34:19 35:4
  36:24 37:7
sincerely  74:22
  75:22
single  54:12
sit  36:22
site  9:24 15:13
sits  59:25
sitting  36:21
six  52:19,25 60:16
size  39:18
sizing  12:19
skin  24:17
small  25:25 65:13
snapshot  30:15
sole  57:8
somebody  15:4,6
  18:16
sorry  8:24 18:20
sound  18:21
sounds  49:16
source  53:18
south  46:24 56:14
  56:17 60:5
southern  1:1 30:13
  46:25
space  19:23 20:3
spaces  19:24 20:1
specialty  12:1,1
specific  8:14 16:10
  16:19 27:25 29:7
  42:25 54:18 58:8
  67:7,13,17
specifically  23:5
  24:19 33:18 67:11

speeds  34:9,11,16
spend  21:20
spitting  40:7
spoken  53:21
ss  70:9 72:3
stacks  54:6
stage  8:13
stain  65:2
staining  37:25
  52:11,11,21,22,23
  53:21 60:10 63:22
  64:15,20 68:9
stains  59:11,13,19
  59:22 64:22,25
  68:8
standing  47:24
start  12:14
started  12:11 14:11
  15:9
state  1:23 20:9 70:8
  70:15 71:21 72:3,7
  72:17
statement  28:17
  34:2 62:20 67:16
statements  20:15
states  1:1
stations  34:15
stenographic  73:9
stenographically
  73:4
step  45:9
stick  60:14
stop  25:4 74:15
storm  23:9,16,18
  23:21,22 25:11
  26:5,16 28:3,9,14
  29:12 30:3,5,12,14
  30:21 31:19,25
  32:7 36:8 42:3 43:8
  54:11

storm's  26:12
  32:20
straight  36:19
  49:13 61:14
strictly  60:23
strike  8:25 17:17
  25:13 43:15
striking  9:9
structure  21:11
studies  57:25 58:3
  58:6,9 62:7 65:1
study  22:17 64:24
  67:5
stuff  10:17 11:12
  14:13 53:11
subject  7:15 71:23
submitting  69:16
subpoena  4:3 7:5,8
  7:10,12,16
subscribed  70:11
subsequent  57:15
subsequently  22:9
substance  71:24
sufficient  74:17
suite  2:4,9 20:3
  74:2,7,15 75:7
summary  4:10 17:7
  17:8 33:9 52:4
supervision  73:12
supplement  58:16
support  57:7
supposed  31:18
sure  7:8 8:16 19:22
  20:2 21:25 22:4
  24:23 25:9 33:13
  47:17 53:10,16
  54:3 64:4 68:6
surprised  38:8
sustained  35:8
sworn  5:4 70:11
  72:10

**system** 29:5
**systems** 12:20,23
  13:2

**t**

**take** 11:15 18:23
  25:19 32:18 35:20
  35:24 36:3,4 39:6
  39:14 45:8 60:13
**taken** 1:21 57:23
  70:2 71:3 74:10
  75:10
**takes** 40:5 58:21
**talking** 21:20 27:24
  52:20,21,23 59:10
**taught** 27:9
**tear** 65:4
**tecum** 4:3 7:5
**telephone** 2:5,10
  74:8 75:8
**tell** 21:9 32:19
  38:18 41:20 46:5
  61:20 64:20
**tells** 27:17 33:23
**temperature** 67:2
**ten** 56:20
**tenant** 19:24 20:1
**tend** 65:23,23
**tennessee** 46:14,17
  56:22 62:18
**term** 52:8 57:22
**terminal** 34:16
**terms** 10:16 19:7
  20:24
**test** 38:14,15,19,20
  60:13
**testified** 5:5 33:14
  34:3
**testify** 8:17 10:11
  20:8 34:7
**testimony** 10:5
  20:12,21 47:12

48:23 61:20
**testing** 40:3 47:14
  48:19 50:15 51:2,8
**thank** 5:8 69:1
**thick** 59:15
**thickness** 53:4
**thing** 16:1 26:2
  40:8 51:3
**things** 46:12 56:14
**think** 20:24 26:2
  32:12 39:21 43:22
  44:19,19 46:16
  47:25 48:1 50:3
  55:11 57:8 61:13
  67:23
**third** 35:10 37:8
**three** 19:24
**tight** 20:22
**tile** 38:22,23 40:18
  41:14 42:2,3 46:9
  47:8,24 49:23
  50:24 55:16,17
  65:17,20,24,25
**tile's** 51:15
**tiles** 37:24 38:4
**time** 12:8 15:22
  21:20 28:18 39:6
  39:25 41:23 48:3
  50:10 58:10 59:6
  59:12,13 62:9 69:1
  69:5 74:17
**times** 59:10,13
**timlichman** 2:2,3
  3:5 5:7 6:10 7:3 8:7
  9:3,9,13 11:2 17:5
  18:4,8,15 21:18
  26:24 30:6 32:14
  35:23 37:5,13 38:7
  39:16 40:12 42:8
  43:5,23,24 44:6,8
  45:6,18,24 46:2,22

47:17,18 48:7,17
  49:1,2 50:1 52:17
  55:19,24 58:2
  60:22 62:4 63:1,8
  63:11 64:3 66:4,10
  66:12,18,21 67:3
  68:25 69:11 74:24
  75:5,6,12
**today** 5:12,23 69:2
  69:7
**today's** 8:20
**tools** 60:18,21
**top** 19:20 33:2
  46:10 60:1 63:19
  64:2,11
**total** 30:12,13
**totals** 30:21
**tower** 74:1,15 75:1
**townhouse** 38:1
**track** 19:1
**training** 15:9,10,11
  27:7,8 52:16
**transcript** 70:5
  71:4,23 73:7,11
  74:13,16,17,20
  75:13,15,18,20,20
**transmitting** 34:21
**treaties** 58:14
**tremendous** 26:13
  53:22
**trial** 20:8,8,13
  33:15,19 34:3
**tried** 40:11
**tropical** 23:9,16,17
  23:21,22 26:5,12
  26:16 28:3,9,14
  29:12 30:3,4,21
  32:20 36:8
**truck** 11:9 12:2,5,8
**trucking** 12:12
  13:19,20 14:23

33:9
**true** 21:22 70:5
  71:23 73:8
**try** 67:5
**trying** 24:17 28:5
  39:23
**twice** 36:16
**two** 12:4 13:4 17:9
  19:24 23:15 57:6
  60:16 62:13,24
**type** 11:10 13:5
  17:24 42:1 43:8
**typical** 59:4
**typically** 56:4
**typing** 35:5

**u**

**ultimately** 23:8
  40:19,20,23
**unable** 67:14
**underneath** 48:21
  49:24 55:16 65:21
  65:22
**understand** 15:19
  24:10 31:10 37:6
  42:11 61:16 63:2
  65:3
**understood** 5:19
  7:23 17:16 20:7
  67:14
**unfortunately**
  16:23
**unique** 18:24
**unit** 54:12,13
**united** 1:1
**units** 12:19
**university** 11:19
**upper** 65:7
**use** 46:17 49:15
  56:21
**usually** 5:17 13:4
  16:8,9 34:14 50:13

56:6

**v**

**various** 15:16 16:3
  27:10 50:8 53:3
**vehicle** 21:12,12
**veritext** 74:1 75:1
**versions** 6:5
**versus** 5:24 19:3,9
  20:9
**vertical** 38:23
**videoconference**
  1:10
**virtually** 40:6
**vision** 47:19
**visual** 14:18 48:11
  57:19 60:11,24
  61:25 64:18
**visually** 49:22
**volumes** 46:20
**vs** 1:6 70:1 71:2
  74:9 75:9

**w**

**waive** 69:13 75:14
**waived** 74:19
**wall** 37:25 38:22,23
  38:25 41:1,3 51:18
**want** 15:5 16:11,24
  22:4,5 36:22 38:18
  51:24 61:5,14,16
  63:14 65:23 69:1,8
  69:13,15
**wants** 16:22
**water** 10:6,9,13
  11:11,11,13 13:6
  14:12,25 15:7 16:1
  19:23,25 21:12
  22:18,25 23:6,9,15
  23:17,23 24:2,3,5
  33:11 36:11,25
  38:20,25 39:8 40:1

40:7,24 41:5,13,22
41:22 42:6 44:18
45:14 52:7 53:8,9
53:13,18 54:4,5,5
54:11 57:4,5,12,14
59:2,7 60:3 67:6,13
67:24
**water's** 64:20
**waterproofing**
  40:25 41:3,13
  42:14 43:12,14,17
  45:1 46:4 47:10
  51:17
**way** 10:16 20:12
  31:25 39:14 46:16
  47:5 53:5 55:10
  57:20 69:5
**we've** 5:13
**weather** 24:7,8,11
  24:14,20,21,23,24
  25:5,17 26:9,22
  27:1,4,5,11,22 28:1
  28:15 29:18,19,23
  32:10,17,22 33:1,1
  33:2,15,18,18 34:3
  34:8,14,15,23 35:4
  35:21 36:1,3,6,22
  37:1,16,20
**website** 35:5
**week** 23:15
**weeks** 15:12 62:17
  62:24
**went** 9:21 11:18
  13:11,18 14:8
  17:21 20:25
**wetter** 59:12
**whatsoever** 63:23
**white** 63:22,25
  64:12,13,13
**wind** 34:6,9,11,16
  42:1,1 50:18

**winds** 35:8
**wish** 51:19
**witness** 3:3 5:3 8:9
  15:21,25 18:5,8,12
  28:7 30:2 32:12
  35:20 37:3 38:6
  39:12 40:10 41:25
  43:3,21 44:7 45:4,5
  46:1,20 47:14 48:5
  48:15,24 52:15
  55:22,23 57:25
  60:20 62:3,22
  63:25 66:20 67:1
  69:9,15 72:1,8,11
  73:6,10 75:14,16
  75:18,19
**witness's** 44:5
**witnessed** 45:5,7
**wood** 59:10,11,12
  59:14,14 65:1
  68:19,21
**woodgrain** 68:24
**work** 12:16 16:4,22
  17:22 18:10 19:2
  47:3 56:25 57:2,3
  59:5 69:14
**worked** 11:25 15:5
  17:8,18 18:19
**working** 13:16
  15:20,21
**works** 20:9 34:5
**world** 49:19
**would've** 64:9
**write** 16:8 22:17
  31:14 37:23 71:4
**writing** 36:7
**written** 33:17
  57:15 58:13 61:8
  61:21,24
**wrong** 48:20

**wrote** 29:14 30:21
  36:23

**x**

**x** 47:19

**y**

**yeah** 11:5 18:25
  20:22 21:24 22:7
  28:16 34:23 46:15
  60:20
**year** 10:2 11:18
  52:19 53:1 56:6,8
  56:10,12,15 58:1,4
**years** 11:22 15:14
  15:18 17:9,10,11
  27:5 44:24 45:10
  52:8,12 53:5,6
  56:19,20 57:22
  58:4,21 60:16
  62:19

**z**

**zoom** 1:10 31:22

FLORIDA RULES OF CIVIL PROCEDURE

Rule 1.310

(e) Witness Review. If the testimony is
transcribed, the transcript shall be furnished to
the witness for examination and shall be read to or
by the witness unless the examination and reading
are waived by the witness and by the parties. Any
changes in form or substance that the witness wants
to make shall be listed in writing by the officer
with a statement of the reasons given by the
witness for making the changes. The changes shall
be attached to the transcript. It shall then be
signed by the witness unless the parties waived the
signing or the witness is ill, cannot be found, or
refuses to sign. If the transcript is not signed by
the witness within a reasonable time after it is
furnished to the witness, the officer shall sign
the transcript and state on the transcript the
waiver, illness, absence of the witness, or refusal
to sign with any reasons given therefor. The
deposition may then be used as fully as though
signed unless the court holds that the reasons
given for the refusal to sign require rejection of

the deposition wholly or partly, on motion under

rule 1.330(d)(4).

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES

ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.

THE ABOVE RULES ARE CURRENT AS OF APRIL 1,

2019.  PLEASE REFER TO THE APPLICABLE STATE RULES

OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.