# EXHIBIT 1

6

## Page 1

```
             UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF FLORIDA
                    MIAMI DIVISION
              CASE NO. 21-cv-23148-CMA


  LEIGH ROTHSCHILD,              Miami, Florida

        Plaintiff,               January 6, 2025

     vs.                         8:23 a.m. to 9:41 a.m.

  GREAT NORTHERN INSURANCE       Courtroom 13-3
  COMPANY,
                                 (Pages 1 to 32)
        Defendant.
  _____

                      MOTION HEARING
           BEFORE THE HONORABLE CECILIA M. ALTONAGA,
               CHIEF UNITED STATES DISTRICT JUDGE

  APPEARANCES:

  FOR THE PLAINTIFF:     JOSEF TIMLICHMAN, ESQ.
                         Josef Timlichman Law, PLLC
                         PO Box 221338
                         Hollywood, FL 33022-1338
                         (305) 748-3789
                         Josef@lawnowfl.com

  FOR THE DEFENDANT:     EVAN HOLOBER, ESQ.
                         Cozen O'Connor
                         2001 M Street Northwest Suite 500
                         Washington, DC 20036-3588
                         (202) 280-6446
                         Eholober@cozen.com

  REPORTED BY:           STEPHANIE A. McCARN, RPR
                         Official Court Reporter
                         400 North Miami Avenue
                         13th Floor
                         Miami, Florida 33128
                         (305) 523-5518
                         Stephanie_McCarn@flsd.uscourts.gov
```

## Page 2

**I N D E X**

**WITNESSES**

| WITNESSES FOR THE PLAINTIFF: | Page |
|---|---|
| -- | |

| WITNESSES FOR THE DEFENDANT: | Page |
|---|---|
| -- | |

**EXHIBITS**

| EXHIBITS IN EVIDENCE | IDENTIFIED | ADMITTED |
|---|---|---|
| Plaintiff's Exhibit No. | -- | -- |
| Defendant's Exhibit No. | -- | -- |

**MISCELLANEOUS**

| | Page |
|---|---|
| Proceedings......................................... | 3 |
| Court Reporter's Certificate....................... | 32 |

## Page 3

(The following proceedings were held at 8:23 a.m.)

THE COURT: Please state your name for the benefit of the court reporter.

MR. TIMLICHMAN: Josef Timlichman on behalf of Mr. Leigh Rothschild.

THE COURT: Thank you. Please be seated, Mr. Timlichman.

Defendant is trying to collect its fees and costs in this action. I've reset the hearing at your request. I don't know if you've had a chance to speak since your conferral regarding these matters has been less than satisfactory.

I understand that the -- let's start with the easy stuff. There is no challenge to the cost; is that correct?

MR. TIMLICHMAN: Yes.

THE COURT: Okay. So an issue is the $129,000 in attorneys' fees. And I know that the Defendant objects to many of Plaintiff's general objections to fees as not being specific enough as required under the rule.

And that could be a basis for me simply granting the motion outright, but I will give you an opportunity, Mr. Timlichman, to go over these fees and tell me why any of these entries should not be compensated. And I'm specifically speaking about Docket Entry 1091. So let's go through it.

MR. TIMLICHMAN: I do think it's worth mentioning, Your Honor --

## Page 4

THE COURT REPORTER: Excuse me. Mr. Timlichman, if you could please get on a microphone, please? I'm having trouble hearing you.

MR. TIMLICHMAN: I apologize.

THE COURT REPORTER: Okay. Thank you.

MR. TIMLICHMAN: I don't know if it's worth bringing this to the Court's attention. You know, we're ready to proceed, if necessary. But we are still engaging in some back-and-forth in trying to resolve the fees. My client has, under confidentiality of settlement, provided a financial disclosure yesterday. I got it from him yesterday, and I sent it yesterday. Mr. Evan had asked me for some additional information that I am now requesting from my client.

I don't know if it would be beneficial or desirable to the Court to possibly see if those conversations can go somewhere before we spend more of the Court's time trying to go through whatever the fees are and the dispute on the amount of fees.

THE COURT: Well, the motion was filed on November 27th after many proceedings involving the issue of entitlement. This is a summary judgment order that was affirmed by the 11th Circuit over two years ago or -- right?

MR. HOLOBER: The order from this court was two years ago.

THE COURT: Two years ago November --

5

            1            MR. HOLOBER:  Yes.
            2            THE COURT:  -- and then it was affirmed.
            3            You know, I understand the Plaintiff's desire to put
            4    this off, right.  It's not pleasant.  But at a certain point, I
            5    need to decide the issue, unless you all want to take this off
            6    the table and I can deny it without prejudice and have the
            7    Defendant come back and refile it.  But I'm not going to have
            8    this sort of sitting here lingering while you all go back and
            9    forth and now engage in some true conferral that did not take
           10    place before.
           11            MR. TIMLICHMAN:  And by no means do I want to come
           12    across combative.  Unfortunately, I am bound by my client's --
           13    you know, his kind of response time.
           14            But he did get his accountant involved in kind of
           15    between November and yesterday.  The end of November, we made
           16    the offer to -- when we had originally come to Mr. Holober with
           17    an offer back in November, we had offered to provide that
           18    financial disclosure, and then conversation kind of went from
           19    there.  And then by the time his accountant came back and gave
           20    me whatever he gave me, a couple weeks came by.
           21            However, it's not -- it would really be up to
           22    Mr. Holober for his client to make the decision as to whether
           23    to hold off on communications.  I think that that would -- it's
           24    not my -- it wouldn't be my place to say that.  I just know
           25    that there was a lengthy appeal process, and then there was

6

            1    some additional motion practice.
            2            I don't want this Court to get the impression that we
            3    were trying to kind of kick the can down the road.  It was --
            4    you know, we felt that there was some merit behind some of the
            5    motion practice.  The Court disagreed with us, which is fine.
            6    That's what you're here for.  And that's kind of what dictated
            7    the communications.
            8            While those motions were pending, we were not engaged
            9    in any kind of negotiation.  So the real substantive
           10    negotiation didn't really begin until the end of November and
           11    then the holiday season, obviously.
           12            So our position, as the Plaintiff, is it would be up
           13    to the insurance -- you know, Mr. Holober's client to make the
           14    decision if they want to toll the motion and then refile it
           15    should conversations not be meritorious, or if he would like to
           16    proceed today, then we would do that.
           17            THE COURT:  Mr. Holober.
           18            MR. HOLOBER:  Your Honor, my client would oppose
           19    putting this off.  You know, the way we see it, we've complied
           20    with all conferral requirements.  The first offer didn't come
           21    until December 13th after the motion was already filed, after
           22    the time to confer had passed.
           23            And we see no reason to delay adjudication of the
           24    motion because, as Your Honor knows, the MSJ order was issued
           25    more than two years ago.  The appeal was determined over the

7

            1    summer.  It's been several months since the appeal, two years
            2    since the MSJ.  We would like to get to the end of the road on
            3    this.
            4            THE COURT:  All right.  Let's go through the billing
            5    records.
            6            MR. TIMLICHMAN:  Sure.  So to kind of help the Court
            7    in terms of where our main concerns were, to save time, we
            8    didn't really find too much issue with the appellate fees or
            9    the billing on the appellate fees.
           10            Really, what we felt was that there were excessive
           11    duplicative things that could've been billed as paralegal
           12    rather than attorney time pertaining to mainly Mr. Holober's
           13    time because he was the main associate on the file.  So I think
           14    it would be best use of the Court's time if we were to focus on
           15    those hours because I don't think we're really objecting to too
           16    many of the others.
           17            THE COURT:  I am looking at Docket Entry 109-1.  So
           18    tell me what your objection is, and you'll get my ruling, and
           19    we'll get a dollar amount at the end.
           20            MR. TIMLICHMAN:  So just as a matter of practicality,
           21    how would Your Honor prefer me -- you want me to go line by
           22    line?
           23            THE COURT:  You tell me.  This is your opportunity,
           24    right.
           25            MR. TIMLICHMAN:  Sure.

8

            1            THE COURT:  You've put forward a general objection --
            2    general objections that are not specific enough for me to work
            3    with.  So this is your opportunity to be heard and identify any
            4    entry because you're not challenging the hourly rates of the
            5    lawyers.
            6            MR. TIMLICHMAN:  Correct.
            7            THE COURT:  So tell me which entry you object to and
            8    why, and I'll hear from Defense Counsel, and we'll go item by
            9    item.  It's a painful process.  But, otherwise, you're making
           10    it painful for me by throwing out these boilerplate objections
           11    that are not specific, and I am not going to go through that,
           12    Mr. Timlichman.
           13            MR. TIMLICHMAN:  I apologize, Your Honor.
           14            THE COURT:  All right.
           15            MR. HOLOBER:  Can I very quickly note something?  On
           16    our motion, we conceded to the paralegal tasks, all that you
           17    marked down as paralegal tasks.
           18            THE COURT:  But he's saying that some of your tasks
           19    should've been handled by a paralegal and not by a licensed
           20    attorney.
           21            MR. HOLOBER:  That's correct.  And we've conceded to
           22    the ones that were marked on the timesheets, that totaled 0.7
           23    hours.  Reducing the hourly rate is an $80.05 reduction.
           24            THE COURT:  I saw that.
           25            MR. HOLOBER:  We concede to that reduction.

                                                                 9

 1            THE COURT:  Right.
 2            MR. TIMLICHMAN:  And then the other one is if you just
 3   look at the actual hours, there is kind of duplicative
 4   billings --
 5            THE COURT:  Show me.  Show me.  Let's go through.
 6   Let's have some concrete examples so you can have my ruling and
 7   you all can do the math.
 8            MR. TIMLICHMAN:  So if we look at -- for example, he
 9   has a double entrance -- double entry on 11/16/21.  I believe
10   that would be on the third page of the 109 exhibit.  And if you
11   look at line -- under 11/16/21, he has the billing for the same
12   work in that and doesn't really separate what the work is.
13            THE COURT:  I'm sorry.  11/16/21, Drafting Responses
14   to Plaintiff's Requests for Admissions.  That's one time entry.
15   The next one is, Begin to Draft Responses to Plaintiff's
16   Interrogatories.  Those are two different tasks, as I see them.
17            MR. TIMLICHMAN:  Right.  And then -- one second.  We
18   felt that, overall, the discovery time to respond to those
19   requests for admission and the interrogatories being billed at
20   a combined total of seven hours was a bit excessive.  I think
21   the response to interrogatories and admissions, based on what
22   we had presented, would not have taken seven hours.
23            Unfortunately, I don't have an expert here to testify
24   to that, but I would concede that the interrogatories and
25   admissions are separate.  So I guess that wouldn't be a great

                                                                10

 1   example.
 2            And if we -- I think it's just the overall -- if you
 3   look kind of down the line of -- between the 11/16 draft and
 4   down to -- for example, on 12/08/2021, it's just --
 5            THE COURT:  Which date?  I'm sorry.
 6            MR. TIMLICHMAN:  It's 12/6/21.  They say, Review and
 7   Revise Draft Discovery Responses --
 8            THE COURT:  Right.
 9            MR. TIMLICHMAN:  -- In Order to Ensure Assertion of
10   Privileges and Objections.
11            They put in, you know, 1.7 hours after already billing
12   four and a half hours and then two and a half hours and then an
13   hour and ten minutes to do the same exact task.  They would've
14   done that within the discovery, and they don't really tell us
15   which specific items they were looking at when they did that.
16            And then if you look at the next line, 12/6/21, they
17   again say, Continue to Draft and Revise Discovery Responses,
18   and they put .70, and they don't really tell us what's going on
19   over there either.
20            THE COURT:  Why don't we have Defense Counsel explain
21   these entries since you have some questions about that.
22            MR. HOLOBER:  Yes, Your Honor.  Well, generally, what
23   the process for drafting discovery responses is is that the
24   associate on the file will take the first path -- well, really,
25   the paralegal will create an outline document to make it go

                                                                11

 1   quicker and as a paralegal task, we find it to be more
 2   efficient.  They will draft an outline document.  The associate
 3   will put in the substantive responses based on review of
 4   pleadings, review of the discovery in the case so far and
 5   review of whatever we've received from our client.
 6            Then after that, the partner will review it, you know,
 7   make sure there is no issues with any specific responses, go
 8   through each of the individual responses, each of the
 9   individual RFP responses, RFA responses for interrogatory
10   responses, make sure there aren't any issues with that, review
11   document production and make sure there's no privileged
12   documents being produced, make sure there is no privileged
13   information being produced in the interrogatories.
14            So with respect to these entries, as they continue to
15   draft responses to interrogatories -- you know, generally,
16   there wouldn't have been a time where, you know, I open the
17   interrogatories and just responded to No. 2, closed it, opened
18   it later.  So, you know, I would've been responding to
19   multiple different entries in one go as I am drafting the
20   document.
21            So that's why they're not broken down into Draft
22   Response Interrogatory No. 1, Draft Response Interrogatory
23   No. 2, and, you know, generally, be doing multiple of those on
24   the same day.
25            You know, we don't believe that that time is

                                                                12

 1   duplicative.  We don't believe there was an instance of
 2   different attorneys doing the same work or a paralegal and an
 3   attorney doing the same work on the same task.  The
 4   contributions by each timekeeper will be different in that
 5   situation.
 6            MR. TIMLICHMAN:  In response to that, Your Honor, I
 7   think the issue there is that if we look at how -- and I don't
 8   mean to poke at the Defense on this.  But if you look at the
 9   original entry from the paralegal, it says, Prepare First
10   Draft, and then when you look at the associate's time entry --
11            THE COURT:  Where is that?  Where is, Prepare First
12   Draft?
13            MR. TIMLICHMAN:  So that's on 11/11/21.  There's three
14   time entries -- Prepare First Draft to Defendant Great
15   Northern's Answers of Plaintiff's Interrogatories --
16            THE COURT:  Um-hmm.
17            MR. TIMLICHMAN:  -- First Request for Admission, First
18   Request for Interrogatories, First Request for Production of
19   Documents, and then the next thing is -- so it's -- you have
20   three entries on 11/11/21 that say, Prepare First Draft,
21   Prepare First Draft, Prepare First Draft.  And each one of
22   those are basically an hour.
23            And as Mr. Holober just testified or proffered, he
24   explained that they will take the first draft, then when you go
25   and you look at Mr. Evan's entries, he's literally writing,

13

1  Draft Response, Draft Response.  It's not saying that he's
2  editing anything.  It's not saying that he's working.  It gives
3  you the appearance, it gives you the feeling of he is now
4  drafting the response for the first time.
5         So you, in essence, have two people drafting these
6  discovery responses for the first time according to how they're
7  billing and wording it.  And then they have the partner looking
8  over the draft discovery responses, which would seem to be
9  duplicative if you've got two people looking over the same
10 paralegal's work from the onset of the case.
11        And I think that they could've done a better job of
12 kind of pointing us to why boilerplate simple discovery
13 requests -- which -- a good portion of our objections --
14 would've needed, you know, between three people, over 15 hours
15 or 20 hours or whatever the total time worked out to.  And I
16 think that's kind of why we felt that they were a little bit
17 duplicative.
18        Because there is really no way to discern what the
19 paralegal did different than what Mr. Holober would've done
20 versus then the ultimate review because Mr. Holober said, Well,
21 I'm the one reviewing what the paralegal does, and then the
22 partner reviews what I'm doing.  So it's a lot of review and
23 not necessarily drafting the way they have it written here.  So
24 I think that's kind of why it came to our attention to say this
25 seems to be a little bit excessive.

14

1         MR. HOLOBER:  We can clarify that.  The work the
2  associate did -- which was me.  The work that I did on these
3  time entries was not merely reviewing what the paralegal did.
4  So the paralegal will first take the service PDF document and
5  basically type out all the information that's on the PDF
6  document into a Word document that we can then put in the
7  responses.  When we get --
8         THE COURT:  By information, you mean information from
9  your client?
10        MR. HOLOBER:  No.  The information -- so --
11        THE COURT:  On the actual request, on the discovery
12 request --
13        MR. HOLOBER:  Yes.
14        THE COURT:  -- what's being asked for.
15        MR. HOLOBER:  Correct.  So what the paralegal --
16        THE COURT:  He or she retypes the actual discovery
17 request.
18        MR. HOLOBER:  Correct.  And then puts -- creates a
19 template document, puts, you know, the request in Word there
20 and then response.  Doesn't put any substantive responses
21 there.
22        THE COURT:  I see.  Because Plaintiff provided you a
23 document, but it was not a document you could work with.  It
24 wasn't a PDF.  It wasn't a Word document you could simply work
25 with.  She or he had to retype it for you.

15

1         MR. HOLOBER:  Correct.  You know, I am not saying
2  Plaintiff did anything wrong.
3         THE COURT:  No.  Right.
4         MR. HOLOBER:  It seems to be the way it goes.  These
5  cases are all PDFs.  And oftentimes, you'll have a line or two.
6  If you want to handwrite the answers, that's fine.  We prefer
7  not to handwrite the answer.  Either way, it takes more space.
8         So the paralegals don't do any substantive drafting --
9  any drafting of the substantive responses in those cases.  All
10 the substantive drafting would have been first done by me and
11 then reviewed by the partner on the case.
12        THE COURT:  And the first draft that you're doing is
13 gathering information from your client and assessing whether or
14 not a request is objectionable and, if so, framing the
15 objection, right?
16        MR. HOLOBER:  Yes.  And also putting in a response as
17 well, you know, if it's not objectionable, or if there is an
18 objection but we're answering it notwithstanding the objection.
19 That's correct.
20        THE COURT:  So then you go ahead and include that
21 narrative or that response admitted/denied, and then the
22 partner on the file is reviewing your work and double-checking
23 it.  So that's pretty customary.
24        MR. TIMLICHMAN:  So, again, Your Honor, I think that
25 his timesheets, unfortunately, are not consistent with the

16

1  proffer he is giving because if we then look to 12/8/21, we see
2  for the first time that they're reviewing the documents that
3  their client sent.  They're not actually telling us back in
4  November 21st that they're reviewing documents from clients.
5  That doesn't happen until December 8th.  And they actually put
6  there, Review and Analyze New Claim Documents Received from
7  Linda Banes, who is, I'm assuming, the adjuster.
8         I think, again, Your Honor, for candor, PDF is very --
9  it's a one-button click to take something out of a PDF and turn
10 it into a Word document.  And we provided them the PDF where
11 you literally just open it in Adobe, press export and it
12 immediately goes into Word.  There is no -- there's nothing
13 locking or blocking it.
14        THE COURT:  So you're saying the paralegal should not
15 have retyped your discovery requests.
16        MR. TIMLICHMAN:  There was no reason to at all.  You
17 could've literally just -- we do it -- it's not a locked
18 document.  It's a PDF, but it's an open-format document if you
19 have Adobe, which you have to to open it.  And I would assume
20 that a firm of their size is subscribing to Adobe.  You
21 literally just press "export" and it becomes a Word document.
22 But we've got one, two, three hours -- you know, almost three
23 hours of them --
24        THE COURT:  Retyping.
25        MR. TIMLICHMAN:  -- retyping a document.

17

                And then again, to your point, Your Honor, they don't
actually tell you that we're looking at documents from their
adjuster until September 8th.  So that's why, again -- and I
wish I had the production.  There was a good amount of
objections there.
                So when you look at the totality of that, if you're
spending 15 hours before you even have a document in from your
client, it begs the question, What are you responding -- what
is the response that you're doing that's taking that long?  We
now understand that they spent, you know, three hours retyping
a document that never needed to be retyped.
                And if you don't have those documents from your
client -- because we know on December 8th that you bill that
you're looking at new clients -- new documents for the first
time --
                THE COURT:  So how were you responding a couple days
before if you didn't have those?
                MR. TIMLICHMAN:  Right.
                THE COURT:  All right.
                Mr. Holober.  I kind of agree with the paralegal time
spent retyping not being necessary.
                MR. HOLOBER:  With respect to the December 8th
entries, those entries are not for the first draft.  So what we
did was we drafted the responses based on information that we
had from the client.  So we received the claim files sometime

18

before -- before PFS.  So that's not reflected in our hour
sheet.  The only things we've served here are the time entries
from after the PFS, was after the date of entitlement on this
Court's entitlement order.
                So on December 8th, we received additional documents
from the client based on our inquiries, inquiries that we had
to the client from when we did our first pass at the discovery
responses.  So, for example, this time -- these time entries on
December 8th about reviewing, revising the drafts, that was
after I sent those drafts to my client and they said either,
you know, This looks good, No comments.
                Unfortunately, that's not what they said here.  They
said, I would like this changed.  I would like this changed.
Take a second look at this.  Take a second look at this.  So
that was a revision of what we had already drafted the first
time.  We're not redrafting the exact same document again.
                And then we did receive some additional claim
documents.  And you'll note here on December 1st, 2021, when
we're going through the client file, we realized that there had
been four prior separate claims on the same property filed by
Plaintiff, and so a lot of the information that we had to see
there.
                And that time entry, which was marked as excessive,
was looking to see if Plaintiff was claiming the same damages
across multiple claims.  There did seem to be a few instances

19

of that.  So that was relevant to our responses to the
interrogatories and our responses to the requests for
production.  And then, you know, figuring out if those
documents from the client, which I believe were 1300 pages --
if those needed to be re -- needed to be served in the RFPs.
                THE COURT:  Right.  I am satisfied with your
explanations except for the ones regarding the paralegal
retyping discovery requests from a PDF that can be simply
converted to Word, have you work from that and then convert it
back.
                MR. HOLOBER:  Candidly, Your Honor, I was not aware of
the export feature.  I am not sure if we had that back in
November of 2021.  It's certainly possible.  I really can't
speak to that right now.  I would think that, even so, there
would be some formatting that needs to be done.  I wouldn't
think it would be, you know, a zero-hour entry.  But if we do
have that feature, that does make sense.
                THE COURT:  Okay.  Next issue.
                MR. TIMLICHMAN:  The next issue that we would bring to
your attention, Your Honor, is -- just to help with the pages,
1, 2, 3, 4 --
                THE COURT:  The pages are numbered at the top.  You'll
see --
                MR. TIMLICHMAN:  Oh, you're a hundred percent right,
Your Honor.  I'm sorry.

20

                So this --
                THE COURT:  What page are we on now?
                MR. TIMLICHMAN:  It says Page 2 of April 6, 2022.
                THE COURT:  No.  I'm looking at the Docket Entry
109-1.  Are you working off of that document?
                MR. TIMLICHMAN:  Yes.  My composite's based on that.
It's Page 7 of 72 of the --
                THE COURT:  7 of 72.  Okay.  That's better.  Thank
you.  All right.
                MR. TIMLICHMAN:  I will do that from now on, Your
Honor.
                So if you look down at 3/18/22, Your Honor, they
billed .8 -- which would be six times eight.  It's 54 minutes
to look at a witness list.  I think my witless list had, like,
four people on it.
                THE COURT:  Well, it's not just looking at it.  It
says reviewing and analyzing it -- right? -- so so-and-so, what
is so-and-so?  What does so-and-so know?  What information
might so-and-so have?  You know, it's not just read the names,
right.
                MR. TIMLICHMAN:  I agree with your assertion of that,
Your Honor, but we had a very simple witness list.  It was
literally Mr. Rothschild, a public adjuster and our expert
witness.
                THE COURT:  Okay.  You're wondering what kind of

21

```
 1  analysis was involved in looking at those three names?
 2        MR. TIMLICHMAN:  Correct.
 3        THE COURT:  Mr. Holober, what analysis was involved?
 4        MR. HOLOBER:  I don't have the witness list in front
 5  of me right now, so I can't fully recall.  I believe there was
 6  another individual who worked for the Plaintiff who was on
 7  there, and I believe we may have been trying to figure out who
 8  that person was, looking through our documents.
 9        But I, again, don't have a copy of the witness list in
10  front of me right now.  And I don't believe it was excessive,
11  but, of course, it's up to Your Honor's discretion.
12        MR. TIMLICHMAN:  I believe we only had three people,
13  Your Honor.  The fourth person was somebody that they wanted to
14  have as a witness, not somebody that we wanted.  It was an
15  assistant to my client who was fired.  And they had a bad
16  relationship, so we certainly didn't want to have them on our
17  witness list.
18        THE COURT:  All right.  So this should probably be
19  reduced to about 20 minutes at best, right?  Plaintiff,
20  adjuster, expert.
21        Okay.  Next.
22        MR. TIMLICHMAN:  So if we look again, Your Honor,
23  on -- this would be -- let me just make sure I give you the
24  right page.  If we look at Page 9 of 72 --
25        THE COURT:  All right.
```

22

```
 1        MR. TIMLICHMAN:  -- they -- on a partner hour, they
 2  put a half -- they put a half an hour to review and analyze
 3  your court order on discovery extensions.  This was a paperless
 4  order that you had submitted through the ECF.
 5        THE COURT:  ECF.
 6        MR. TIMLICHMAN:  I don't think it would've taken a
 7  person more than six minutes to have to read that.  And, you
 8  know, if you want to ponder on if that's another six minutes --
 9  but how we get to half an hour to look at a paperless order is
10  beyond me.  So I think that's a little bit excessive.
11        MR. HOLOBER:  Can you say the page number for that one
12  again?
13        THE COURT:  9 of 72.  And that's Mr. Dickenson's time
14  entry of half an hour reviewing a paperless order.
15        MR. HOLOBER:  Sure.  I think generally when you're --
16  you know, it's easy to say that a certain task could be done in
17  under six minutes.  You know, even the time we don't think
18  about -- but even opening your email and opening a document
19  does take time.  Realistically, there are very few tasks that
20  can actually be done in under six minutes.
21        That said, again, I don't have a copy of the
22  discovery -- of the order in front of me.  I can't recall if it
23  was a paperless order or not.  I assume it would've reset some
24  of the discovery deadlines, but I don't recall.
25        THE COURT:  Okay.  That was on April 7.  It's
```

23

```
 1  actually -- it's not a paperless order.  It was an order
 2  modifying pretrial deadlines granting in part and denying in
 3  part the parties' joint motion for extension of time, and it
 4  gives three new dates for fact discovery, expert discovery and
 5  motion -- dispositive motion deadline.
 6        MR. TIMLICHMAN:  I had it as a paperless order in my
 7  notes, Your Honor.  I apologize for the discrepancy.
 8        THE COURT:  That's all right.
 9        And this was a joint motion that Mr. Dickenson filed.
10  And it changes the deadlines slightly from the deadlines that
11  were requested in his motion.  So there are slight differences
12  in the three dates that the parties requested and the three
13  dates that Judge Cooke gave you.  And you're saying it took
14  half an hour to consider that?
15        MR. HOLOBER:  My understanding is yes, Your Honor.
16        THE COURT:  All right.  So I would agree that's a lot
17  of time to ponder those three differences and just put them in
18  your tickler system and adjust.  So, yes, let's reduce that to
19  12 minutes, two 6-minute entries.  All right.
20        Okay.  Next.
21        MR. TIMLICHMAN:  Next one on that same page, Your
22  Honor, if we go down to 4/26/2022 --
23        THE COURT:  Um-hmm.
24        MR. TIMLICHMAN:  -- we see again that they have a
25  review and analyze of the photographs and estimates from a
```

24

```
 1  claim and litigation, photograph and estimates from -- this is
 2  a prior claim, so they have already billed us four and a half
 3  hours, as you recall in their discovery, and now they're trying
 4  to bill another two and a half hours to analyze those same
 5  exact documents, to review those same exact documents and to
 6  make the same comparisons that Mr. Holober told us that he was
 7  doing at the time of discovery back in -- whenever those
 8  discovery responses were in December of 2021, which was about
 9  four months prior.
10        I would imagine that at the original time, somebody
11  would've taken some notes, you know, wrote down some -- you
12  know, whatever they formulated.  Two and a half hours spending
13  time looking over the same documents and going through the same
14  material does seem a little bit excessive.  I would imagine at
15  that point you're going back to these documents maybe to
16  confirm something.
17        In my humble opinion, even a 30-minute time period at
18  that point is -- you know, you're either looking for
19  information you have identified when you spent the four and a
20  half hours on it or some note confirming something.  But two
21  and a half hours would suggest that you're basically starting
22  the process all over again, and I think that's a little bit
23  excessive.
24        THE COURT:  All right.
25        Mr. Holober.
```

25

 1    MR. HOLOBER:  In the earlier entry that we looked at
 2  earlier, we were looking at four different, separate claims.  I
 3  believe it was a total of 1300 pages.  That was more, you know,
 4  overview review to see if there could be any overlap.  We
 5  determined there was potential overlap with this one claim,
 6  which was the kitchen claim from 2018.
 7    This April 26th time entry was a bit more of a
 8  detailed dive into those exact documents, actually comparing
 9  photos side by side, which wasn't necessarily what we did
10  during the first review.  The first review, we were trying to
11  figure out the scope of the different claims.  The second
12  review, we were trying to figure out whether exact items had
13  already been claimed.  My recollection is some of the kitchen
14  cabinetry and kitchen tile had been.  I don't -- I can't say
15  that with a hundred percent certainty, as I sit here right now.
16    But during this second review on April 26, what we're
17  doing is we were comparing to figure out those -- you know,
18  comparing photos from that prior claim to the photographs from
19  this claim to figure out exactly which items had already been
20  claimed before and to figure out if any of the damage had
21  gotten worse over time.
22    MR. TIMLICHMAN:  Your Honor, if I may shed some light
23  briefly on that.  Unfortunately for me, my client failed to
24  tell me about these prior claims, and that's shame on him.
25    However, if we look at it pragmatically, they spent on

26

 1  average of an hour -- a little bit more than an hour, an
 2  hour-15 minutes, on each claim, just listening to Mr. Holober.
 3  And then coming back and saying that we need another two and a
 4  half hours to compare what would be a half a page of line items
 5  from Xactimate with probably 15 photos a second time around,
 6  Your Honor, I think that's a little bit -- it's excessive
 7  because the overlap was kitchen cabinets.
 8    He had a termite claim.  Then that termite claim, the
 9  kitchen cabinets were paid for.  It's -- you're looking at an
10  Xactimate estimate.  It would be five or six line items on a
11  schedule with pictures on the back of an adjuster report.
12    To suggest that the four and a half hours that they
13  spent originally wouldn't have been enough to be able to say,
14  Hey, wait a second.  These kitchen cabinets were paid here, and
15  then to say, I need another two and a half hours, four months
16  later, I think, again, it just begs the question of why would
17  it necessitate -- what was so complex about that that it would
18  take them two and a half hours.
19    If you look within that same timeframe, Your Honor,
20  they billed 90 minutes to analyze and review.  If you look just
21  above on 4/21/22 -- and this time it shows you -- you know, I
22  believe that to be a more accurate time.
23    You know, they say, Here we're reviewing and analyzing
24  estimates and photographs of Plaintiff's property to determine
25  whether the floor tile is continuous with the excess floor, and

27

 1  that took them under an hour.  You know, there is a lot more
 2  flooring within that house -- because it was all continuous --
 3  than there was kitchen cabinets.  You know, you're talking
 4  about 15 feet, 15 linear feet, of cabinets versus there was
 5  about 3800 square feet of flooring.  So it's just not
 6  consistent with the billing that we're seeing.
 7    And I just think that they -- you know, they got their
 8  four and a half hours to start.  It's not fair to then come
 9  back and say, Well -- and we will later see within the scope of
10  the billing they keep coming back to that same file and -- that
11  same 2018 file, and they keep reviewing and analyzing that same
12  2018 file.  And it just begs the question at a certain point --
13  you should've been able to memorize it already.  You know,
14  there's not enough going on over there.  So that's just why we
15  felt it was excessive.
16    MR. HOLOBER:  There were several hundred pages in that
17  2018 file.  Again, I can't remember the exact number of pages
18  off the top of my head.  But in this 4/26 review, it was kind
19  of difficult to figure out exactly whether or not there had
20  been repairs made.  We found -- it appears from our review that
21  there were no repairs made.
22    But the photographs that we saw of the kitchen were
23  from different angles, and, you know, we had to find, you
24  know -- when you're looking through exactly to figure out
25  whether something has been replaced, you have to see, Is that

28

 1  the same handle?  Has the handle been replaced? because a lot
 2  of the kitchen cabinetry does look very, very similar.
 3    So that's what this more exacting review was about;
 4  was figuring out whether or not that those items that had been
 5  charged -- that had been charged to the insurance company in
 6  2018 -- whether or not they had actually been replaced and, you
 7  know, being able to definitively say whether or not they were
 8  replaced.  Because if we're able to say that they were paid and
 9  not replaced, we're able to take that out of the scope of
10  damages for our claim.
11    THE COURT:  It's an apartment, right?
12    MR. HOLOBER:  Yes, Your Honor.
13    THE COURT:  All right.  Let's reduce that to two hours
14  rather than two and a half.
15    On this point, we'll have to pause.  I did say I had a
16  9 o'clock hearing.  The parties and the lawyers are behind you
17  now.  We'll take a brief recess and continue when I'm done with
18  this 9 o'clock hearing.  Perhaps you gentlemen might want to
19  talk in the conference room behind you and see if you can make
20  some more progress on some of these objections and let me know
21  what, if any, resolution you have when we resume.
22    MR. TIMLICHMAN:  Thank you, Your Honor.
23    MR. HOLOBER:  Thank you.
24    THE COURT:  Thank you.
25    (A recess was taken from 8:59 a.m. to 9:32 a.m.)

29

```
 1              COURT SECURITY OFFICER:  All rise.
 2              THE COURT:  Please be seated.
 3              MR. TIMLICHMAN:  Good morning, Your Honor.  So we were
 4     able to speak.  So there's two things going on, Your Honor.  My
 5     client has made an offer that has not been accepted or rejected
 6     by the insurance.  What he is asking is if you would be -- if
 7     you would consider sending us to the magistrate today to see if
 8     we can hammer out a settlement.  Alternatively, should your
 9     Court feel that that's not -- futile or whatever, we did agree
10     on a joint reduction that we can work off of.
11              But my client wanted to express that he did make an
12     offer.  They have, in fact, rejected that offer.  And if we
13     could be sent to the magistrate to try to settle it today while
14     Mr. Holober is here, while I'm here, he felt that that would
15     be -- you know, that that's an avenue he would love to explore.
16              THE COURT:  But your client's not here, though, right?
17              MR. TIMLICHMAN:  No.  But I would be able to get
18     settlement authority from him.
19              THE COURT:  All right.  Let's check to see if the
20     magistrate judge is even available.
21         (Pause in proceedings.)
22              THE COURT:  All right.  Judge Reid is available, and
23     you can go over now to her courtroom and/or chambers.  I am not
24     sure where that will be handled.  It's in the Atkins building,
25     and she will do this for you now.
```

31

```
 1     She is making herself available.  If you all don't come to a
 2     resolution today, then there will be a resolution on this
 3     motion, which has been pending now for over a month.
 4              MR. TIMLICHMAN:  Fair enough, Your Honor.
 5              THE COURT:  Okay.  So what is the dollar amount?
 6              MR. HOLOBER:  The dollar amount would be, with respect
 7     to fees --
 8              THE COURT:  If the costs are not challenged.
 9              MR. HOLOBER:  Yeah.  With respect to fees, the dollar
10     amount would be $122,194.95.
11              THE COURT:  Okay.
12              MR. HOLOBER:  That represents the $7,000 reduction of
13     the amount that we sought in our reply, which is ECF Document
14     No. 119.
15              THE COURT:  Okay.  Again, I won't enter anything --
16     and I won't enter anything until tomorrow in the hopes that you
17     all can come to some amicable resolution before Judge Reid, who
18     is on the third floor of the Atkins building.  So you just need
19     to walk across the street, and she is waiting for you.
20              MR. HOLOBER:  All right.  Thank you.
21              THE COURT:  Thank you.  You both have a good day.
22         (The proceedings concluded at 9:41 a.m.)
23
24
25
```

30

```
 1              MR. HOLOBER:  Your Honor, before that, where we were
 2     was Plaintiff wanted to go before the magistrate to work on a
 3     settlement conference.  Separately, you know, my understanding
 4     is that both of our clients have agreed to a reduction of this
 5     amount so that we're no longer taking this Court's time.  I am
 6     not sure that my client is available for a settlement
 7     conference throughout the course of today.
 8              But, you know, with respect to the pending motion, my
 9     understanding is that we do have an agreement on a reduction of
10     hours, and then we would go to the magistrate judge to try to
11     work out the amount that's actually put into my client's hands.
12              THE COURT:  So I'll enter an order at the close of
13     business today, giving you all the opportunity to see if your
14     client is available by phone to work out anything before Judge
15     Reid.
16              What is the dollar amount?
17              MR. TIMLICHMAN:  Your Honor, very respectfully and
18     only because I have to because I represent a client and not
19     because I would ever want to be combative with the Court, we
20     would ask Your Honor to reserve on this because I feel that if
21     I went back to my client and had to do settlement negotiations
22     with a judgment to it added, it may push the parties further
23     apart.
24              THE COURT:  I won't enter any order.  But you've asked
25     for today to speak with Judge Reid.  Judge Reid is available.
```

32

```
 1                       C E R T I F I C A T E
 2
 3         I hereby certify that the foregoing is an
 4     accurate transcription of the proceedings in the
 5     above-entitled matter.
 6
 7     _10/01/2025_   _____
          DATE        STEPHANIE A. McCARN, RPR
 8                    Official United States Court Reporter
                      400 North Miami Avenue, 13th Floor
 9                    Miami, Florida 33128
                      (305) 523-5518
10
```